GEDDES et al. v. ANACONDA COPPER MINING CO. et al.

(District Court, D. Montana. June 29, 1912.)

No. 1,086.

1. CORPORATIONS (§ 401*)—CONTRACTS—COMMON OFFICERS—VALIDITY.

Contracts between corporations having a common director, while not prohibited, are voidable, imposing the burden, on those who would sustain them, to prove by clear and satisfactory evidence that they are entirely fair and free from wrong.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1363, 1364, 1595; Dec. Dig. § 401.*]

2. CORPORATIONS (§ 189*)—SALE OF ASSETS—MINORITY STOCKHOLDERS—RIGHT TO INJUNCTION.

Where two corporations had a common director who largely controlled their management, a proposition to sell all the assets of one of them to the other in consideration of $1,300,000 of the buying corporation's capital stock was prima facie voidable at the instance of minority stockholders of the selling company who were entitled to an injunction restraining the completion of the transaction until it was proved by the buying company's officers that the transaction was fair and free from fraud after a disclosure of all their knowledge concerning the selling company's property.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 706–722; Dec. Dig. § 189.*

Rights of minority stockholders as to management of corporate affairs, see note to Wheeler v. Abilene Nat. Bank Bldg. Co., 89 C. C. A. 482.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes

In Equity. Suit by Peter Geddes and others against the Anaconda Copper Mining Company and others. On application for preliminary injunction. Granted.

Walsh & Nolan, for complainants.

C. F. Kelley, L. O. Evans, W. B. Rodgers, and D'Gay Stivers, for defendants.

HUNT, Circuit Judge. Peter Geddes et al., who are minority shareholders in the Alice Gold & Silver Mining Company, incorporated under the laws of Utah, and doing business at Butte, pray the court to annul a deed of all the property of the Alice Gold & Silver Mining Company to the Anaconda Copper Mining Company, a corporation also doing business at Butte. The consideration for the transfer of the property of the Alice Company to the Anaconda Company is 30,000 shares of the capital stock of the Anaconda Company, worth about $1,300,000. The application for immediate consideration is that an injunction issue restraining the Anaconda Copper Mining Company from transferring the stock in question pending the litigation, to the end that, if the facts upon final hearing should warrant the court in granting the relief prayed for, the stock received by the Alice Company as a consideration for its property may be restored to the Anaconda Copper Mining Company. Defendants resisted the application, and hearing was had.

Among the grounds relied upon by the complainants for a restraining order is this: That the sale is void because there is a substantial identity between the parties who negotiated and carried out the sale and the parties who negotiated and carried out the purchase. The contention, stated in the briefest way, is that the defendant the Anaconda Copper Mining Company, and the Alice Gold & Silver Mining Company, in which latter corporation complainants are shareholders, are both in practical effect directed or controlled by Mr. John D. Ryan, who it is proven was, at the time of the transaction involved herein, a director in both of said corporations and held the position of president of the Alice Gold & Silver Mining Company. The Alice Company was incorporated in 1881 with 400,000 shares of par value of $25 for each share.

At the time that the Alice Mining Company sold its property to the Anaconda Company, the majority of the stock of the Alice Company was owned by the Butte Coalition Company, a stockholding corporation holding stock in mining corporations in Butte. In this corporation also Mr. Ryan was a director at the time of the sale of the property of the Alice Company to the Anaconda Company. Furthermore, it appears that the Amalgamated Copper Company, also a stockholding corporation, owns a majority of the Anaconda Copper Mining Company's stock, and about one-twentieth of the capital stock of the Butte Coalition Company, and that in the Amalgamated Copper Company Mr. Ryan was and is a director and vice president.

The Butte Coalition Company referred to was organized about 1906 to hold the majority of the stock of the Alice Mining Company, heretofore referred to, and all of the stock of the Red Metals Mining Company. The Red Metals Mining Company was also organized about

1906, and became the owner of certain valuable copper mining properties in and about Butte which had for a long time theretofore been the subject of bitterly contested litigation between mining interests commonly regarded as belonging to or controlled by the Amalgamated Copper Company and those commonly known as belonging to or controlled by Mr. F. A. Heinze. Settlement of all the differences between the litigants in these contests was had about 1906, and transfer of title was made to the Red Metals Mining Company, and thereafter the Butte Coalition Company became the owner of the stock of the said Red Metals Company. It appears that certain of the stockholders of the Alice Mining Company, who sent proxies to vote at the meeting held at Salt Lake in May, 1910, to consider the transfer of the property of the Alice Company to the Anaconda Company, designated as one of their attorneys one of the counsel who had been and was then one of the counsel of the Anaconda Copper Mining Company. Again, the same counsel who acted for the Anaconda Copper Mining Company acted for the Red Metals Mining Company in harmonizing the relationships of the properties of the Red Metals Mining Company toward the properties of the Anaconda Copper Mining Company when the Amalgamated-Heinze litigation ended in 1906. It also appears that Mr. John Gillie, general superintendent of mines of the Anaconda Copper Mining Company, has for some years been connected with the Alice Company; such connection having its origin in some agreement had by Mr. Gillie with Mr. Ryan, though no compensation was ever paid to Mr. Gillie by the Alice Mining Company. Mr. Gillie appears, too, to have acted in an advisory capacity to the Red Metals Mining Company.

The Alice properties, consisting of many quartz claims which are on the hill north of Butte, appear to be lowgrade, below the 1,000-foot level. The Alice claims are situated just west from and contiguous to certain of the properties of the Anaconda Company. The main shaft is nearly 1,500 feet deep. About 1893, the mines were flooded up to the 1,000-foot level. The water was kept at that level until 1899, when a mill then upon one of the claims was closed down, and the water rose to the 200-foot level. Within the Alice properties there are veins—some large, others smaller, with zinc and some lead, with apparently a large body of ore, much of which is refractory zinc. For years prior to the sale of the Alice property to the Anaconda Company, the Alice Company's interests were in charge of Mr. Buzzo. When advice was necessary with respect to mining matters, he consulted with Mr. Gillie, of the Anaconda Company, and, when legal matters arose, he consulted with a gentleman who was also one of the counsel of the Anaconda Copper Mining Company. There were some leases made upon the Alice property upon which certain royalty payments were made, which payments were deposited to the credit of the Alice Company, up to the time when the Anaconda Company took over the property. The receipts of the Alice Company were not sufficient, however, to take care of the expenditures. When the transfer was made to the Anaconda Company, the Alice Company was indebted to the Butte Coalition Company in about $34,000. It cannot be said that the Alice Min-

ing Company was insolvent, though it appears to have been a losing corporation. However, no effort, other than the sale under investigation, appears to have been made to sell the property or to finance the company so that it could operate, or to dismiss the debt of $34,000 due to the Butte Coalition Company; nor is there anything to show that the Butte Coalition Company was seeking to collect the debt. The property seems purposely to have been kept idle for years past. Nor does it appear that efforts to exploit the property have been recently made. Surely owners of a property which sold for the equivalent of $1,300,000 would have had little or no difficulty in raising $34,000 due to another corporation.

While the Alice paid dividends in years gone by, since 1898 it has paid none. There is evidence tending to show that the main lode, which runs easterly through the Alice properties, is the Rainbow—a large lode which runs northeast and southeast. At the time that the Alice Company voted to transfer its property to the Anaconda, it was not properly equipped for any mining necessities, and, doubtless, before any extensive equipment should be put upon the Alice, exploration work would have to be done. For some years before the Butte Coalition Mining Company acquired the stock of the Alice Company, the stock of the Alice was depressed to a very low point, at one time even to 12 cents a share; but in 1906 and 1907 stock sold for $5, $6, and $7 a share. The operations of the company ceased about 1899. The Alice, which had yielded gold and silver, was not then regarded as a copper producer, but the general history of the Butte Camp is that it is not until deep mining is carried on that copper ores become the principal product of the mines. That the Alice property is of great value is to be inferred from the value of stock agreed to be paid as fair by the Anaconda Company. That Mr. Ryan, managing director of the Anaconda Company, must have had some specific detailed knowledge of ore bodies in the Alice, their extent, character, and value, which would warrant the payment of $1,300,000 for the property, is an irresistible inference. We all know that the science of mining has been so far advanced within the last 15 years that it enables engineers to express clear and definite opinions of mine values. Mere chances have given way to highly reasonable expectations based upon exploitation, study of geological conditions, assays, mineralogy, and improved commercial facilities for reducing ores.

In its practical effect, the matter under investigation involves what may be called the absorption of the Alice Mining Company by the Anaconda Company. We must not confuse the proposition with that of a possible agreement to purchase the entire possible output of the Alice Company; that is to say, we must bear in mind that the proposed transaction here is not that of taking the possible product to mine which the Alice Company was organized, but is to take all the property itself, and to leave the Alice Company only a stockholding corporation.

I do not think the evidence justifies a conclusion that at the time that the circular letter of April 27, 1910, to the stockholders of the Alice Company was issued, the object in view was to dissolve the

Alice Company, inasmuch as the letter itself not only is wholly silent concerning dissolution, but expressly states the purpose of the meeting to be to submit to the consideration of the stockholders and to have them pass upon the proposed contract of sale between the Alice Company and the Anaconda Company, which proposition, if approved, would result in the sale and transfer of all of the property and securities of the Alice Company to the Anaconda Company, in consideration of the issuance and payment by the Anaconda Company of 30,000 shares of its capital stock.

Assuming that such a transfer would be valid, though approved by less than the unanimous consent of the stockholders, I cannot think that this may be done against the objections of minority stockholders, unless it has been made to appear that such change is for the best interests of the Alice Company and its shareholders. Here, for instance, it is charged that the proposed transfer is for a consideration which is inadequate, in that the mines of the Alice Company are worth many times more than $1,300,000, the value represented by the stock in the Anaconda Company which it is proposed to turn over to the stockholders of the Alice Company. Of course, it may be that upon the trial these averments of inadequacy of consideration will be held for naught. But suppose they are true, would not a court of equity prevent the consummation of the contract of sale? It seems clear that, considering all the interrelated associations of the corporations heretofore referred to and of the directorships of Mr. Ryan in the several companies, minority shareholders have a right to call upon the courts to require the purchasing company, through those of its directors who were also interested in the selling company, to disclose everything which they knew concerning the value of the Alice, the sources of such knowledge, the reasons for the sale, and the fairness thereof. Thus it devolves upon Mr. Ryan to show that all knowledge which as a director of the Anaconda he obtained concerning the Alice properties was given to the directors and shareholders of the Alice Company.

[1] Upon principle, contracts between corporations having a common director should be regarded very much as are contracts between individual directors and their corporations. Such contracts are not prohibited; nor are they prima facie void or fraudulent, but they are voidable, and it is a safe rule of conduct which imposes upon those who would sustain them the duty of showing clearly and satisfactorily that they are entirely fair and free from wrong. In the light of the complexities which have come to surround corporate transactions whereby interlocking directorates are frequently acting for corporations dealing with each other, opposing interests are often involved. For example, plainly it is to the interests of a corporation which sells its property to receive as large a consideration as properly possible for it. Equally clear is it that it is to the interests of a buying corporation to buy for as small a price as it properly can. But if we have one director who is a managing director acting for the selling concern who at the same time represents the buying concern, and who is a managing director in it, necessarily we have an apparent conflict

of interests, a conflict that upon complaint by minority shareholders the law may become concerned with and will inquire into with exceeding circumspection.

The books are not harmonious in their discussion of the better view to take of a transaction such as the evidence discloses the one under examination was. But after reading the many cases cited and others referred to by text-writers, we can well approve of the doctrine stated by Thompson that such contracts, while not void, are voidable. He says:

"Contracts between corporations having a common directory are regarded by the courts very much with the same suspicion as contracts between individual directors and their corporations. Some courts have gone to the extent of holding that such contracts are prima facie fraudulent and void. But the more general as well as the more reasonable rule is that such contracts are not void but voidable. And the fairness of such contracts must be shown by clear and convincing proof, and it must be made to appear that they are absolutely free from fraud. Contracts between corporations having a common directorate are voidable, although there was a quorum in each board of directors who were not directors in the other. The contracts of directors of two corporations are not void but voidable only." 2 Thompson on Corporations, § 1242.

The same author also writes as follows (section 1243):

"Contracts of consolidation, lease, or sale are frequently entered into between corporations where the directors of the one are largely interested in the stock of the other; or where one corporation owns a majority of the stock of the other contracting corporation; or where the stockholders of the two corporations are practically the same. Such contracts are governed by the same rules, substantially, as those where directors deal with themselves, or with the corporation. They are not necessarily void, but if there is actual fraud, or if any undue advantage is taken, or the contract is unfair, the courts will give relief at the instance of the injured party. Thus, where a majority of the directors were interested in a contract adversely to the stockholders of the other contracting corporation, the contract was held illegal, and the fact that the directors made the contract openly did not validate it. So, minority stockholders may have a lease canceled which is made by officers and owners of a majority of the stock to another corporation."

[2] My conclusion is that the burden is cast upon the defendants to satisfy the court by evidence from those who were in the best position to know all the facts and circumstances, that the whole transaction was fair and absolutely free from oppression or wrong. And clearly, until trial of the main action is had, it is just to all concerned that the stock should not be transferred by the Anaconda Company to the Alice Company.

Questions raised by complainants and not herein discussed are reserved until the facts have been adduced upon trial.

Complainants' motion to file their amended bill is hereby granted.

Injunction pending litigation will issue, upon complainants' filing a bond in the sum of $5,000, with conditions that complainants will pay all costs and damages which defendants may suffer by reason of injunction order if it shall finally be determined that they were not entitled thereto.