BOYD et al. v. NEW YORK & H. R. CO. et al.

(District Court, S. D. New York. January 29, 1915.)

1. COURTS ⬅347—EQUITY RULES—PLEADING—ANSWER.

Under the new equity practice, defendant is required to show all his propositions, whether of law or fact, at once in the answer, and the court on a motion to determine points of law authorized by Equity Rule 29 (198 Fed. xxvi, 115 C. C. A. xxvi) may consider whether, in view of the facts alleged, any of the legal theories propounded can properly be considered before testimony taken, or by merely taking such evidence as has previously been often adduced in support of a plea, so that, when defendant claims that the complaint shows no case for equitable relief, he may not complain if the court considers the admissions or allegations of the answer which explain or enlarge, but do not contradict, the allegations of the bill.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 921; Dec. Dig. ⬅347.]

2. COURTS ⬅347—EQUITY PRACTICE—DEMURRER.

One whose answer, under the reformed equity practice, objects generally to the bill, must be considered as having done so not only on what complainant shows, but also after having had his own conscience purged.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 921; Dec. Dig. ⬅347.]

3. EQUITY ⬅184—SEVERAL DEFENDANTS—DEMURRERS BY ONE.

Where one of several defendants to a bill, after stating his own actions or position by answer, raises an issue of law, and other defendants deny knowledge regarding the first defendant, any relief to which complainant is entitled on the statement of such defendant would not be stayed by an allegation of his codefendant's lack of knowledge.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 422–425; Dec. Dig. ⬅184.]

4. EQUITY ⬅371 — PRACTICE — MATTERS OF LAW — DETERMINATION BEFORE TRIAL.

A legal proposition, going to less than the whole case made by a bill in equity, should not be decided in advance of final hearing, unless such decision will add to or eliminate from the case a clearly defined and easily stated mass of testimony, the presence or absence of which will not change or affect the method of presenting other aspects of the litigation.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 782; Dec. Dig. ⬅371.]

5. COURTS ⬅347 — PRACTICE — RULES — PRAYERS — "ALTERNATIVE" — "CAUSE OF ACTION."

The term "alternative," as used in Equity Rule 25 (198 Fed. xxv, 115 C. C. A. xxv), allowing relief to be stated and sought in alternative forms, means mutually exclusive, and the term "cause of action," being defined as composed of the right of the complainant, and the obligation, duty, or wrong of the defendant, combined, a bill praying the destruction of a railroad lease as obnoxious to the Sherman Act (Act July 2, 1890, c. 647, 26 Stat. 209 [Comp. St. 1913, § 8820]), and also the preservation of the present status of the stock of the lessor company which depended entirely on a lease sought to be annulled, was not fatally defective because the prayers were inconsistent.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 921; Dec. Dig. ⬅347.

For other definitions, see Words and Phrases, First and Second Series, Cause of Action.]

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. MONOPOLIES ☞10—RAILROAD CONSOLIDATION—LEASE—SHERMAN ACT.

If a railroad lease created a control or unity of competing interests forbidden by the Sherman Act, the fact that it long antedated the statute did not render the act inapplicable.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 9; Dec. Dig. ☞10.]

7. MONOPOLIES ☞24—RAILROAD LEASE—SHERMAN ACT—INVALIDITY—PRIVATE INTERESTS—RIGHT TO SUE.

Minority stockholders of a railroad company in private litigation have no right to enforce the Sherman Act to set aside a prior lease of the assets of one company to another, but may invoke the law to prevent a subsequent consolidation prejudicial to their rights and involving a breach of contract.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. ☞24.]

8. RAILROADS ☞142—CONSOLIDATION—EXERCISE OF RIGHT—CONTRACTS.

The right of railroads to consolidate, given by a state statute, is merely permissive, and hence it is no violation of the statute for a railroad to contract against the exercise thereof.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 444-447; Dec. Dig. ☞142.]

9. CORPORATIONS ☞180—LEASE OF ASSETS—CONTROL—MINORITY STOCKHOLDERS.

Where a railroad corporation controlled another corporation by its ownership of a majority of the stock, and also by a lease of its property, it was a trustee of such property for the minority stockholders.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 665-673; Dec. Dig. ☞180.]

10. RAILROADS ☞144—CONSOLIDATION—LEASES—RIGHT TO CONSOLIDATE—MINORITY STOCKHOLDERS.

Where, under existing leases and contracts, the dividends or annual returns on stock of the H. Company, a majority of which was owned by the C. Company, which was operating the H. Company's railroad under a lease, must be paid before the C. Company's stockholders could obtain anything, and, if this was not done, the system by which the C. Company obtained access to its terminal station in New York City would be disastrously affected, and the H. Company's shares were worth, by reason of such guaranty, many times what the shares of the C. Company were worth, the minority shareholders of the H. Company were entitled to enjoin the C. Company from dissolving such rights by a consolidation.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 392, 393, 451-455; Dec. Dig. ☞144.]

Bill by John Scott Boyd, Junior, and others, against the New York & Harlem Railroad Company, and the New York Central & Hudson River Railroad Company, and others, to restrain a consolidation between the New York & Harlem Railroad Company and the New York Central & Hudson River Railroad Company. On motion by complainants under Equity Rule 29 (198 Fed. xxvi, 115 C. C. A. xxvi) for decision of points of law in respect to the cause or causes of action stated in the bill, raised by portions of the answer of defendants or some of them. Motion granted.

John S. Sheppard, Jr., and William N. Cohen, both of New York City, and Jacob M. Dickinson, of Chicago, Ill., for complainants.

Alexander S. Lyman, of New York City, for defendant New York Cent. & H. R. R. Co.

Anderson & Anderson, of New York City, for individual defendants and the New York & H. R. Co.

Charles F. Brown, of New York City, for all defendants.

HOUGH, District Judge. The defendant railway corporations (hereinafter called, respectively, the "Harlem" and the "Central") are too well known to need description. The individual defendants are directors of both railways, and constitute a majority of each corporate board. The complainants are stockholders in the Harlem, and citizens and residents of states or countries other than New York.

The object of the bill is to enjoin a consolidation of the Harlem and Central; "consolidation" meaning that merger of railroad corporations into one company permitted by the Railroad Law of New York (chapter 49, Consol. Laws; chapter 481 of 1910, as amended by chapter 506 of 1911).

The legal propositions advanced by complainants as justifying their demand are: (1) That consolidation would violate the contractual rights of Harlem shareholders—rights secured by the written agreements under which the Central has long operated the Harlem properties as an integral part of the transportation system usually described as the "New York Central Lines." (2) Such consolidation, by producing legal unity of two railways in addition to the present centralized control, would be a violation of the "Sherman Act." And (3) even the existing control of the Harlem by the Central, though based upon contracts made long before the passage of the "Sherman Act," became unlawful when that statute sprang into existence, and is to-day a violation of federal law.

The business reasons impelling complainants to prefer Harlem stock to that of any company formed by the union of Harlem with Central may be summarized from the allegations of the pleadings, thus:

The Harlem owns a railroad from Forty-Second street, New York City, to Chatham, N. Y., with a branch from Melrose to Port Morris, where it meets the Central's track; and such ownership and junction existed in 1873.

In that year the Central leased the Harlem for a term of centuries under a rental scheme which included a payment direct to Harlem shareholders, of so large an annual return that for each share of Harlem stock the Central (with the consent of the New York Public Service Commission) has publicly offered 3½ times its par value.

The terms of the lease of 1873 also relieved the Harlem from the necessity of providing for the fixed charges on its bonded indebtedness, the burden of which has, by advance in values and diminution in interest rate, become trifling.

By a supplementary agreement of 1882, ratified by the stockholders of both Central and Harlem, the two companies disabled themselves from changing the terms of rental during the period of demise, and, in "order to secure the individual interest" of each Harlem shareholder,

every such holder was specifically authorized to "prosecute such suits as may be necessary in the premises, to recover his proportionate part" of the stipulated rental, i. e.. the guaranteed dividend on Harlem shares; a dividend increased in 1898 by allotment to the Harlem shareholders of part of a saving in interest effected by a refunding of the company's bonded debt.

The payment of annual returns on Harlem stock is peculiarly well secured, by the fact (so well known as to require no proof) that the transportation service of the New York Central Lines enters Manhattan Island, and enjoys the advantages of the Grand Central Station, by using the Harlem's right of way. The terminal facilities of 1873 have (as stated in the answers) been greatly enlarged by the Central's funds, but it still remains true that the property conveyed by the Harlem lease is of vast, though unascertained, value, and vital to the activities (as at present arranged) of the Central in the city of New York.

The intrinsic value of Harlem's property is alleged to be "not less than two hundred million dollars" over a bonded indebtedness of $12,-000,000 only. This is denied; but an offer of 3½ times par for the stock (of which there is and can be but $10,000,000 par) proves an opinion of value on the part of the principal defendant consistent only with a security of return as nearly absolute as the possibilities of business, politics, invention, and war will permit.

The foregoing is more than a digest of the bill; some facts (not inconsistent with any statement by complainants) are taken from the answers.

The reasons for demanding relief now are alleged to be that especially of late years the Central has bought Harlem stock, until it owns today 62 per cent. thereof. No more than 66⅔ per cent. is needed to carry through a consolidation under the laws of New York. Such merger would extinguish the lease which in effect pledged the Central's own property and earnings to satisfy the price of hiring, and leaves the Harlem free to take back its vastly appreciated estate if the price be not paid; and for such singularly desirable security would substitute mere participation in a united and more heavily incumbered property, where the much larger Central stock could always outvote the Harlem interest, and subject the present securely segregated Harlem property to the lien of mortgages demanded by the needs and ambitions of the Central.

As to whether consolidation is intended by the Central, the answers of the Harlem and the individual defendants profess ignorance; but the Central itself, while denying any purpose of presently acquiring absolute control of the Harlem's railroad properties, admits and asserts:

"That it has in view and is favorably disposed towards at some future time the uniting and vesting in one corporate entity of all the properties and franchises of the Central Company with those of the Harlem Company, demised by said lease, whether by consolidation or otherwise, and that it intends to exercise such rights as are incidental to the ownership of capital stock in said Harlem Company."

The answer then proceeds to argue that Central has spent so much money on Harlem's properties, and will be obliged to spend so much more, that:

220 F.—12

In order "to meet the public needs * * * the acquisition of as large a proportion of (Harlem's) capital stock as is reasonably practicable is in pursuance of a just and prudent policy on the part of this defendant."

The Central might as well have said plainly, "We shall buy all the Harlem stock we can, and merge the companies as soon as we think best."

The pleadings are under the Equity Rules of February 1, 1913, and each answer contains matter tendering issues of law. Complainants have thereupon made this motion.

The matter specified in the notice of motion may in part be described with accuracy, in terms of the old practice. The Central has demurred generally to the whole bill.[1]

All the defendants have asserted by answer that private complainants cannot in this form of action avail themselves of the prohibitions of the Sherman Act, and all assert that the consolidation of the Harlem and Central is not within the purview of the statute.[2] With some hesitation I think these contentions would formerly have been raised by motion to expunge.

These probable equivalents are referred to only as aids in passing from old to new; for, if the modern practice is worthy of acceptance, its excellence will not arise from doing only the old things under new names. The new method must show itself a better, quicker, more far-reaching instrument for ascertaining truth; otherwise it were folly to trouble ourselves with new names.

[1] There is nothing novel in embodying and presenting legal propositions in an answer, and the points thus presented may be of every degree of importance.

What is new is the obligation on defendant to show all his propositions at once, whether of fact or law, and let opponent and court consider whether, in view of the facts alleged, any of the legal theories propounded can profitably be considered before testimony taken; or by taking merely such evidence as has heretofore been often adduced in support of a plea.

Evidently this casts a burden upon judicial discretion hitherto unknown. Many a judge has heard in succession a demurrer, a plea or two, and several motions before getting to an answer, and never seen, nor thought he had a right to see, the whole defense at a glance. Whether the panorama now afforded is real reform depends almost altogether on how sympathetically and skillfully the new procedure is administered. That early efforts will sometimes be mistakes is to be expected.

This case affords opportunity and imposes necessity of considering at least two points, which are of importance to the scheme of procedure, and not merely in this litigation: (1) Where an answer asserts that the bill states no case, can any fact allegations of defendant's pleading be considered? (2) When defendants raise legal propositions go-

---

[1] This is the effect of sections 1 and 6 of the motion, taken together.

[2] This is thought to be the result of sections 4 and 5 of the motion. Motion paragraphs 2 and 3 will not be further referred to. I consider the specified parts of the answers as merely irrelevancies, provoked by superfluous allegations in the bill.

ing to less than complainant's whole case, what test can be suggested to guide the court in deciding whether to consider or decline the points in advance of final hearing?

On the first point, it seems to me clear that, when defendant alleges that complainant shows no case at all, he cannot complain if the court considers any admission or allegation of the answer which explains or enlarges (but does not contradict) the bill of complaint.

[2] One who "demurs generally" nowadays must be understood to do so, not only on what complainant shows, but also after having had his own conscience purged. Thus only is avoided the old and bad habit of trying everything else before stating facts.

[3] Similarly, where one defendant demurs after stating his own actions or position, and other defendants deny knowledge regarding the first defendant, any relief to which complainant is entitled on the statement of No. 1 will not be stayed by his fellow's lack of knowledge.

For these reasons I have above recited the Central's admissions as to consolidation, and feel free to act on them, notwithstanding the ignorance of the other answers.[3]

[4] On the second query, I am of opinion that no legal point (going to less than the whole case) should be decided in advance of final hearing, unless such decision will add to or eliminate from the case a clearly defined and easily stated mass of testimony, the presence or absence of which will not change or affect the method of presenting the other aspects of the litigation.

Applying this to the case at bar, it seems advisable now to pass upon the applicability of the Sherman Act, because the propositions of complainant evidently require much expensive fact evidence for ultimate solution, which (if defendants are right) it will be useless to prepare and present.[4]

[5] There is one criticism of the bill, mentioned in arguments and briefs, to which preliminary consideration may be given. It is urged that the bill contains two inconsistent "causes of action." It does, in my opinion, show inconsistent prayers for relief, because it demands (1) the utter destruction of the lease of 1873, as obnoxious to the Sherman Act, and also (2) the preservation of the present status of Harlem stock, which depends wholly upon the very lease sought to be annulled.

But it is not thought that such inconsistency is either fatal to the bill, or constitutes a serious blemish thereupon; and for two reasons: First, the prayers of a bill are not parts of the cause of action therein set forth; and, second, inconsistent and even contradictory prayers are permitted by Equity Rule 25 (198 Fed. xxv, 115 C. C. A. xxv), which allows relief to "be stated and sought in alternative forms."

"Alternative" means "mutually exclusive" (Cent. Dict.), and no phrase could more happily describe the prayers of this bill. "Cause of

[3] It is at least difficult to understand how a majority of the Central's directors can deny knowledge of what the Central itself states at length.

[4] If this view of the new practice prevails, it furnishes an argument for the suggestion often made that each equity case be assigned in limine to a particular judge—a system which would at least make for speed and consistency.

action" has not been found easy of definition. But Prof. Pomeroy's effort, that it is "composed of the right of the plaintiff and the obligation, duty or wrong of the defendant; and these combined, it is sufficiently accurate to say, constitute a cause of action," has been adopted in Veeder v. Baker, 83 N. Y. at page 160; while the shorter statement of Durham v. Spence, L. R. Ex. Cas., 46, that it "is that which produces the necessity for bringing an action" has been approvingly quoted in Shelby, etc., Co. v. Burgess Co., 8 App. Div. at page 448, 40 N. Y. Supp. at page 873.

In the light of these definitions, I find, in plaintiffs' "statement of the ultimate facts upon which" they ask relief, only one cause of action; for their right is single, viz., to preserve their property, the duty of the defendants is to co-operate in such preservation; and the wrong alleged is a threatened trespass upon that right.

The prayers are but the opinions of the plaintiffs as to the proper method of redress, and inconsistency there is harmless. The court must select that method which is appropriate and lawful, and such procedure as is illustrated by this motion will produce a selection with the minimum expenditure of time and expense.

A very great interest in the new procedure must excuse the foregoing rather lengthy preface.

I have stated complainants' three propositions, and will consider them inversely to the order of statement.

[6] If the lease of 1873 created a control or unity of competing interests forbidden by the Sherman Act, the fact that such obnoxious arrangements long antedate that statute does not render the act inapplicable. Louisville & Nashville R. R. v. Mottley, 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671.

[7] Complainants, however, have no standing to demand in this private litigation the abrogation of the lease, the restoration of the status of 1873, nor the sale by the Central of its Harlem stock. (First and second prayers for relief.) Such efforts are a usurpation of the functions of the executive; it does not lie in the power of private citizens to assume at will the duties of an Attorney General. Actions thus privately brought would be even more privately settled. The certain scandal and endless confusion resulting from such freedom of action are the sufficient reasons for cases like National Fireproofing Co. v. Mason Builders' Ass'n, 169 Fed. 259, 94 C. C. A. 535, 26 L. R. A. (N. S.) 148.

But if private litigants have and seek to assert a private right which is molested, or in danger of violation; and if such actual or threatened infringement consists not merely in contract breaking or other private delict, but also gives rise to transgressions of public law—then private litigants may invoke that law and urge as an additional and potent reason for protecting their private rights the fact that the threatened assault upon the same will constitute not only a breach of obligation but a public wrong. De Koven v. L. S. & M. S. Ry. Co. (D. C.) 216 Fed. 955.

It follows that in this case the Sherman Act is measurably applicable; and if it be shown that the contractual relation of centralized control now existing between the Central and the Harlem, directly and not in-

cidentally affects interstate commerce, that such relation constitutes an actual or attempted monopoly or restraint of interstate trade, that such restraint is unreasonable, and the merger or consolidation permitted by the statutes of New York would be an act extending and strengthening a control already contravening rational law, or creating a new relation or union illegal under federal statutes, then findings of the nature just outlined would be ground, not for uprooting all that has been done, but for maintaining the present status, and complainants' present rights, until such time as the Attorney General chooses to act. But obviously much evidence is necessary to decide whether the facts warrant any decision based on the Sherman Act.

There remains the inquiry whether the consolidation asserted as imminent in the bill, and admittedly desired by the Central, would be a violation of plaintiffs' contractual rights, independently of the Sherman Act.

[8] The right to consolidate is merely permissive; it is no violation of any statute to contract against the exercise of such a right. Noyes' Intercorporate Relations, §§ 18 and 24.

[9] There cannot be any public policy of the state of New York rendering it obligatory upon these corporations to unite; for the Central is a trustee by virtue of its control of Harlem stock, and the plaintiffs and other minority shareholders are its cestuis que trustent. Farmers' L. & T. Co. v. New York & Northern R. R., 150 N. Y. 410, 44 N. E. 1043, 34 L. R. A. 76, 55 Am. St. Rep. 689. Possibly minority shareholders who obstructed a public enterprise might have their property taken for the public good, by some proceeding in the nature of condemnation; but no such statutory remedy exists at present.

[10] The act authorizing consolidation (supra) requires that upon any merger the capital stock of the consolidated company shall not—

"exceed the sum of the capital stock of the corporations so consolidated at the par value thereof. Nor shall any bonds or other evidences of debt be issued as a consideration for, or in connection with, such consolidation." Section 141.

It follows that the only method, by which the superior value of Harlem as compared with Central stock can be maintained, is by giving to Central shareholders less than share for share, and by no method can Harlem stock (as represented by consolidated stock) be assured that preferred position which it now occupies.

Under existing leases and contracts, the dividends or annual returns on Harlem shares must be paid before the Central shareholders can obtain anything, and, if this be not done, the system by which the Central obtains access to the Forty-Second Street Station is disastrously dislocated.

Consolidation would therefore mean not only an exchange of shares of one name for shares of another, or of a thing of one kind for another thing of the same kind, but would involve a complete destruction of investment in character and quality. Existing arrangements give to Harlem shares rights preferred over all Central stock in the earnings of the entire system now consolidated in control. After consolidation, Harlem shareholders might have more shares, but "shares" would not

mean the same thing, and the return thereon would necessarily be subject to greater and more numerous hazards than is now the case.

The agreement of May 15, 1882, is a sufficient justification to these plaintiffs for protecting their interests by direct suit, and the same document amounts to a lawful undertaking on the part of the Central always to pay to each and every shareholder in the Harlem that holder's proportion of the "annual rent reserved by and to be paid under" the lease of 1873.

Any possible form of consolidation now authorized by the statutes of New York must involve a breach of this contract on the part of the Central; for, whatever Harlem shareholders may get after merger, they can never get their share of the "annual rent" reserved by the lease of 1873.

It results that in my judgment the complainants' bill does set forth a cause of action, and that such cause of action is established by the answers to the extent of entitling complainants to the relief demanded in the third prayer of the bill, viz., that the Central and the Harlem and the said defendant directors be enjoined during the term of the lease of 1873 from taking any steps toward consolidating said companies, or merging the Harlem with any successor to the Central.

An order may be entered declaring, in substance: (1) That the bill of complaint does contain facts sufficient to constitute a cause of action. (2) That the matter alleged in the eighth and sixteenth paragraphs of the complaint (applicability of Sherman Act) are material and relevant to complainants' alleged cause of action, and may (if hereafter supported by competent evidence) afford ground for relief additional to that arising from complainants' contractual rights.

As the result of this motion, the parties are advised that, if complainants choose to move on the pleadings for an injunction pendente lite embodying (mutatis mutandis) the third prayer for relief, such motion will be granted; and, if they elect to abandon the Sherman Act as a basis for action, a final decree for permanent injunction, as sought in said third prayer, will be forthwith granted.

In the language of rule 29 (198 Fed. xxvi, 115 C. C. A. xxvi), I think, after considering the answers, that there is no "principal case" left for trial, so far as plaintiffs' contractual rights are concerned.

