GEDDES et al. v. ANACONDA COPPER MINING CO. et al.

(District Court, D. Montana. May 1, 1915.)

No. 1086.

1. CORPORATIONS ⊗⇒519—PROPERTY—SALES—ADEQUACY OF PRICE—EVIDENCE.
   In a suit by minority stockholders of a mining corporation to set aside a sale of the company's property to another corporation in exchange for stock of the other corporation, some of the directors being common to both corporations, evidence *held* not to show that an adequate price was obtained for the property.

   [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2085, 2088–2089, 2091, 2093; Dec. Dig. ⊗⇒519.]

2. MINES AND MINERALS ⊜➡105—MINING CORPORATIONS—POWERS—SALE OF PROPERTY.

Where a mining corporation was dormant or had been unprofitable for a long period, and its property could be worked only after a great expense, the directors cannot be compelled to borrow the money to resume operations and to explore further for ore, but the corporation has a common-law power to sell its property without unanimous consent of its stockholders.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 229, 229½; Dec. Dig. ⊜➡105.]

3. CORPORATIONS ⊜➡318—ACTS OF DIRECTORS—GOOD FAITH—BURDEN OF PROOF.

The rule that, where there is a conflict of interest in the discharge of a fiduciary duty, the transaction, if not void, may be impeached by the beneficiary, and will be closely scrutinized by the courts, and set aside if the trustee does not establish its fairness, applies to a sale of its property by one corporation to another, where some of the directors are common to both corporations, though the common directors do not constitute a majority of either number.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1363, 1364; Dec. Dig. ⊜➡318.]

4. CORPORATIONS ⊜➡377—PROPERTY—CONVEYANCES—EXCHANGE FOR CORPORATE STOCK.

A corporation cannot, without unanimous consent of its stockholders, exchange its property for stock in another corporation, unless a disposition thereof was immediately necessary, and a cash purchaser could not be obtained, or a substantially larger sum could be realized from the exchange than from a sale.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1531–1534; Dec. Dig. ⊜➡377.]

5. CORPORATIONS ⊜➡318—SALE OF STOCK—SUIT TO SET ASIDE—RELIEF AWARDED.

Where the evidence does not show that a sale of property of a corporation, which could sell its property without unanimous consent of its stockholders, but which was made to another corporation who had common directors, was for a greater price than could have been obtained in open sale, the sale will not be unconditionally set aside; but a public resale will be ordered, the property to be struck off to the highest bidder, if thereby a greater amount is realized—otherwise, the former sale to remain undisturbed.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1363, 1364; Dec. Dig. ⊜➡318.]

In Equity. Suit by Peter Geddes and others against the Anaconda Copper Mining Company and others to set aside a sale of property of a corporation. Decree rendered, directing a public sale of the property on condition that a greater price be received than was received at the former sale.

Walsh, Nolan & Scallon, of Helena, Mont., for plaintiffs.

C. F. Kelley and L. O. Evans, both of Butte, Mont., W. B. Rodgers, of Anaconda, Mont., and D'Gay Stivers, of Butte, Mont., for defendants.

BOURQUIN, District Judge. This is a suit by minority stockholders of the Alice Company to avoid an executed sale of all Alice property to the Anaconda Company (both defendant corporations) for stock

of the latter. It will suffice to say the grounds alleged are that the Anaconda is of a copper combine in unreasonable restraint of interstate trade, and that to serve its purposes therein it secured control of Alice, and against plaintiffs' dissent accomplished said sale for an improper and inadequate consideration. The answer is of denials and justification, sufficiently hereinafter appearing. Disposition of said stock was enjoined pending suit. 197 Fed. 860.

The court refrains from determining the issue involving the Sherman Anti-Trust Act, because unnecessary, in that all the relief warranted is otherwise awarded. Furthermore, in Wilder v. Refining Co., 236 U. S. 165, 35 Sup. Ct. 398, 59 L. Ed. ——, decided by the Supreme Court February 23, 1915, it is emphasized that for familiar reasons the act is not available, in attack at least, save as in it provided, viz., at the suit of the government to dissolve and enjoin and punish conduct by it made unlawful, and at the suit of private parties injured by its violation to recover the treble damages it awards. This general language is beyond the necessities of the decision and will not conclude the court in a case like this at bar. Shawnee Compress Co. v. Anderson, 209 U. S. 423, 28 Sup. Ct. 572, 52 L. Ed. 865, indicates that in a proper case minority stockholders may enjoin and undo corporate acts ultra vires, because of violation of the Sherman Act. Act July 2, 1890, c. 647, 26 Stat. 209. For though said case involved a contract not fully executed and though the basis of the decision is somewhat vague, it must rest upon the Sherman Act to whatever extent interstate commerce was involved, in that in respect thereto the said act monopolizes the field. And see Boyd v. Railway Co. (D. C.) 220 Fed. 180.

[1] Coming direct to the issues upon which this decision is based, the court finds that the price paid for the Alice property was substantially inadequate, and because thereof, of the methods of sale, of the nature of the consideration and its intended disposition, and of the dissent of Alice minority stockholders (plaintiffs), the court concludes that plaintiffs are entitled to relief.

[2] At the time of sale Alice was dormant. Its long-time specific operations for silver had finally failed, and it was in debt, its plant destroyed, its mines closed and flooded, an expense, and unprofitable for some 17 years next prior to the sale. Alice was ripe for dissolution and distribution of its assets to stockholders. Although it had large bodies of unworkable zinc-silver ores, and much virgin ground, under such circumstances no rule of law obligates a corporation to borrow, if possible, necessarily large sums of money to pay debts and expenses, or to enable it to rehabilitate its mines and experiment and explore, however desirous minority stockholders might be to assume the risk; for that is matter of judgment, in which the majority control. By reason of the circumstances there was common-law power, coextensive with any possibly given by statutes or articles, without unanimous consent to sell all Alice property. This property consisted of about 140 acres of fairly compact mining ground, embracing three-quarters of a mile of the Rainbow, the great lode that first made Butte famous for silver. Its many claims contained other lodes and unexplored ter-

ritory. Its known silver ores were exhausted, but it has large bodies of zinc-silver ores, the discovery of a process to reduce which was not hopeless at the time of sale, nor now. Though the Rainbow lode is without the copper section of the Butte district, and is not known to contain copper ores of value, from a trace to above 1 per cent of copper had been found in some indefinite places and extent in Alice.

Defendants' experts testify that in Alice copper is a remote possibility; plaintiffs', that it is a geological probability. The former are of opinion the price paid for Alice—30,000 shares of Anaconda, of a market value of $1,500,000, and assumption and payment of all Alice obligations and debts, indefinite in amount—was fair and liberal to Alice; the latter, that Alice was worth at least $3,000,000, and one of them, Walter Harvey Weed, declares he would have advised against sale because of "unearned increment" from development and discoveries tending in Alice's direction, and that at $5,000,000 to bring to the producing stage Alice "is a very good gamble." John D. Ryan testifies the price for Alice was arbitrarily fixed—"it had to be; it could not be otherwise"—and Weed inclines to the view that mining values are arbitrary. Ryan further testifies that "on a gamble" in 1906, having purchased control of Alice at the rate of $600,000 for the whole, from the standpoint of Alice he believes the sale to Anaconda for $1,500,000 was a "very good trade and a very good profit," and that since Anaconda's resources and not too distant workings would enable it to more cheaply explore Alice at depth in the "speculative hope" of finding something, from the standpoint of Anaconda it was a justifiable purchase, and Anaconda "could well afford to take the gamble involved." (Of course, when Ryan bought control of Alice, its quotations immediately rose. One of plaintiffs contributed 11,000 shares of Alice to the Ryan purchase and immediately purchased more at a much higher price.)

It would serve little to detail the facts, circumstances, and reasoning by which the parties arrive at their widely different conclusions, for the fact remains that upon the gamble, inspired by possibilities or probabilities, hopes or expectations, Anaconda paid for Alice an arbitrary price of $1,500,000 plus. If there is any reason to believe this was the limit, that an open field would not have produced a purchaser more optimistic and less conservative than Anaconda, and who would have paid more, it is not apparent.

It is clear there is no market value for such properties. Their price is arbitrary. It is not alone the value in sight, but also all that hopes of valuable discoveries or ability to resell to the speculative public will inspire some one to pay; and this often involves more in the nature of the personal equation than accurate knowledge or scientific attainment. Anaconda paid a large price, but in view of the extent and history of Alice and of the district—the latter's tendency to confound experts by unexpected discoveries supporting the prospector's dictum, that "ore is where you find it"—the price was not so large that it can be said it is clear there was no reasonable prospect of a larger price. Anaconda could *afford* to pay more than any other, but the question is: *Did* it pay more than any other *would* have paid? And in view of the

common directors of vendor and vendee the minority stockholders were entitled to have this question answered by the acid test of a public sale in open market, whereat Anaconda might have purchased if the highest bidder. An arbitrary price is prima facie unreasonable, and when assailed as unfair under circumstances like those involved, who defends it as reasonable must prove it.

[3] Because of common directors the learned judge who granted the injunction held the burden was on defendants to clearly demonstrate the sale was fair, and the case was tried on that theory. This burden has not been sustained. It is not clear the price paid was substantially adequate, and so the court finds it was not.

It is impossible to reconcile the cases upon the law of common directors. See Cook, Corporations, § 658 et seq.; Thompson, Corporations, §§ 1242, 1243; Thomas v. Railway Co., 109 U. S. 522, 3 Sup. Ct. 315, 27 L. Ed. 1018; Leavenworth v. Railway Co., 134 U. S. 689, 10 Sup. Ct. 708, 33 L. Ed. 1064. The rule is a good one, and general, that wherever fiduciary relations exist and in discharge of duty there is conflict of interest, if the transaction is not void, as it often is, it is open to impeachment by the beneficiary, will be closely scrutinized by the court, and if the trustee does not make manifest its fairness it may be set aside or other relief granted. Corporate transactions like this at bar ought to be subject to this rule. That the common directors were not a majority of either board is a difference in degree, but not in principle. They may have dominated the board. In both cases is divided duty, conflicting interest, possible impaired judgment of unknown effect, difficulty of proof, and danger to stockholders. In either case inadequacy of price is unfairness, and condemns without further inquiry in an attempt to determine whether due to corruption or honest, but mistaken, judgment unconsciously swayed by adverse interest. There is no safety otherwise.

The sale was incident to a consolidation of Butte copper properties, and to all intents and purposes was by Butte-Coalition to Amalgamated, by reason of interlock and control in the relations of eight or nine corporations involved. Ryan was vice president and director of Butte-Coalition, and president and director of Amalgamated, and he was president and director of Alice, and director of Anaconda. B. B. Thayer was director of Butte-Coalition, and he was president and director of Anaconda. Not a majority of any board, the power and influence of Ryan and Thayer are obvious. It is fair to say, however, that though their private interest was not inquired into, and though their future lay with the quick, and not with the dead, of these corporations, there is nothing to inspire belief that they aimed at aught but fair bargaining, or that they designed injury to Alice and consciously abused their trust. Prejudice to Alice would be betrayal of Butte-Coalition, organized by Ryan, and of his associates and friends. Ryan knew less of Alice than was known to its stockholders from inspection and reports. He had not seen its flooded depths, but to one of plaintiffs they were familiar.

Some 2,000 feet from any Alice territory, and in part within veins that may penetrate it, there was Anaconda incipient development of ore

.chutes and production of copper, locally encouraging and known to Ryan, but of little consequence in relation to Alice value and sale. Alice was idle when Ryan purchased control and at cost transferred it to Butte-Coalition, and it so continued, but from no purpose but reluctance to then take the hazard of its financing and operation. It was more or less continuously worked in a small way by lessees, and was open to examination and experiment upon its zinc-silver ores by any one. Therein was earlier failure of costly efforts, and during Butte-Coalition's control of Alice there were two extensive investigations by large zinc operators, both of whom reported adversely thereon. The magnitude of the price paid for Alice does not warrant suspicion; otherwise, the larger the price the greater the suspicion, neither logic nor law. However, common directors and inadequacy of price invoke the rule aforesaid.

[4] Additional ground for relief is that the transaction was not a sale, but a swap. One year thereafter proceedings were instituted to dissolve and distribute the stock to Alice stockholders. Now, Alice had not capacity to acquire corporate stock, save under exceptional circumstances—that disposition of its property was of urgent and immediate necessity, and that no cash purchaser was available, or that by trade a substantially larger sum could be realized, or the like—absent here. It is of the contract between corporations and their stockholders that any sale of all corporate property to distribute proceeds to stockholders shall be for money, the ultimate measure of value. A stockholder is not bound to accept anything but money for his equitable share of corporate property, nor bound to permit a sale to be made for other chattels or goods to be distributed. Although Alice directors personally contemplated sometime dissolution of Alice and distribution of the Anaconda stock, not finding expression in contemporaneous board action, it did not deprive the taking of the stock of the quality of a permanent investment.

In respect to this latter ground for relief the cases are likewise in conflict, perhaps more in relation to the nature of than to the right to relief. See Cook, Corporations, § 671. The instant case in principle resembles Mason v. Pewabic Mining Co., 133 U. S. 50, 10 Sup. Ct. 224, 33 L. Ed. 524. The difference between them is also of degree only. For a proposed sale of all property of a corporation in process of dissolution by the majority to a new corporation by them organized, and for its stock to be distributed to the former's stockholders, is substantially like an executed like sale for like consideration and purposes by a majority of a corporation contemplating dissolution to another corporation in which they are interested, so far as the rights of minority stockholders are concerned. The rule of the Pewabic Case is that any stockholder can insist that any sale of all corporate property upon dissolution shall be to the highest bidder for cash, and not to a corporation in which the majority are interested and for its stock at prices fixed by them. It will be remembered that Butte-Coalition controlled Alice and was heavily interested in Anaconda by reason of a trade of its own mining property—that is, the Red Metal property—to Anaconda for 500,000 shares of Anaconda stock.

[5] In the matter of relief to be granted, it appears plaintiffs own 12,560 shares of Alice, of 400,000 shares outstanding. At the time of sale Butte-Coalition owned about 234,000 said shares. The sale was ratified by 289,590 shares, and opposed by 5,500. The answer alleges that since this suit commenced Alice stockholders anxious to receive their proceeds of the sale were accommodated by Amalgamated exchanging Anaconda stock for Alice stock upon the basis of the sale, to the extent of 353,446 Alice shares, and which includes that of Butte-Coalition, but no proof was made thereof. In any event, at least 34,-000 shares of Alice are owned by others than the parties hereto and Amalgamated. A court of equity will model relief so that all parties in interest, whether before the court or not, will be protected.

As before stated, the majority could lawfully sell Alice. The minority's right was a fair sale for money, to the end that each thereof received in money the value of his equity in Alice property. Their present right is to sufficient relief to still accomplish that end. The sale is not to be unconditionally set aside, however; for, unless the property can be sold for more, the interests of all the parties hereto, and of those stockholders who neither appeared nor complained, require it shall not be disturbed. The method of the Pewabic Case will be followed as near as may be. The value of the Anaconda stock paid for Alice was $1,500,000. Some $300,000 dividends thereon have since been paid. What was the amount of debts and obligations of Alice assumed by Anaconda does not appear. The decree will provide that a resale will be made, and provided, when made, if no bid greater than the total proceeds to Alice as above be made, and provided thereupon defendants pay to plaintiffs and all those entitled thereto the money value of their equity in the proceeds of the sale heretofore made—that is, their proportionate share of the market value of the Anaconda stock at the time of the sale and of the dividends thereon—no resale will be made, and the sale involved will be undisturbed. Thereby defendants will gain no advantage, plaintiffs will suffer no loss, and all Alice stockholders will receive their just dues.

Further proof will be received, and orders made to enable the decree to be executed.