BROWN v. PENNSYLVANIA CANAL CO. et al.

(District Court, E. D. Pennsylvania. February 8, 1916.)

No. 677.

1. CORPORATIONS ⟨⟩486—CORPORATE MORTGAGES—SINKING FUNDS—RIGHTS OF BONDHOLDERS—"NET EARNINGS."

A railroad company organized a canal company to take over a canal owned by it, and provided for an interlocking directorate. The canal company executed a mortgage and gave the trustee, a railroad official, power to select the officers and managers of the canal company, and the canal was conducted as a department of the railroad. The mortgage provided that the canal company would each year, out of its net annual earnings, if sufficient, provide a sinking fund of $20,000, but, if not sufficient therefor, then a sum equal to such net annual earnings for the payment of the principal of the bonds, such sinking fund to be invested by the canal company in the bonds thereby secured or in other good securities. All the charges and earnings of the canal company were to be applied to interest as well as principal. The railroad company was a party to the mortgage, and indorsed on the bonds an agreement to purchase any of the interest coupons not paid by the canal company, and in a suit to foreclose the mortgage it was interpreted as requiring the redemption of interest coupons so taken up by the railroad company before payment of the principal. *Held,* that the bondholders had a right to have the net earnings of the canal company to the extent of $20,000 a year applied to the sinking fund provided for payment of the principal, instead of paying interest on the bonds, and thereby relieving the railroad company of its obligation to purchase the coupons, since, while "net earnings," in bookkeeping language, means a balance, or what remains.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

after something has been deducted, the deductions to be made can only be determined from the occasion for the use of the words, or from the context.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. ☞486.

For other definitions, see Words and Phrases, First and Second Series, Net Earnings.]

2. CORPORATIONS ☞486—CORPORATE MORTGAGES—SINKING FUNDS—RIGHTS OF BONDHOLDERS.

If the railroad company was bound to purchase unpaid coupons attached to bonds in which the sinking fund was invested, it was a wrong to the bondholders to cancel such bonds, thereby depriving the sinking fund of the interest to accrue, while, if it was not so liable, it was a wrong to the bondholders to invest the sinking fund in securities which bore no interest.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. ☞486.]

3. CORPORATIONS ☞482—FORECLOSURE OF MORTGAGE—JUDGMENT—CONCLUSIVENESS.

The decree in the foreclosure suit, in which it was determined that the interest coupons taken up by the railroad company were to be first paid from the proceeds of the mortgaged property before payment of the principal, though conclusive as between all persons bound thereby on all questions involved in it, did not bar a suit to require the railroad company to account to the bondholders for the loss sustained by its diversion of moneys from the sinking fund, or depletion of the fund for its benefit.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1870, 1877–1888; Dec. Dig. ☞482.]

4. CORPORATIONS ☞318—LIABILITY FOR ACTS OF OFFICERS AND AGENTS.

Though there was no direct evidence that the railroad company had, by any corporate action, anything to do with the sinking fund, it was a fair inference that the common officers and agents of the two corporations, in diverting the sinking fund so as to benefit the railroad company, were acting for and by command of the railroad company.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1363, 1364; Dec. Dig. ☞318.]

In Equity. Suit by Alice Francis Brown against the Pennsylvania Canal Company and others. On trial hearing on bill, answer, and proofs. Decree for plaintiff.

John Cadwalader, Jr., and Thos. Raeburn White, both of Philadelphia, Pa., for plaintiff.

John Hampton Barnes, of Philadelphia, Pa., for defendant Pennsylvania Canal Co.

Francis I. Gowen, of Philadelphia, Pa., for defendant Pennsylvania R. Co.

John G. Johnson, of Philadelphia, Pa., for trustee.

DICKINSON, District Judge. The questions raised and argued out in this case, so far as they call for discussion at the present time, are involved in the relations of the parties growing out of the transactions in which they were engaged, the proper construction of the contracts, in which they all had part, and the legal consequences of other litigation, to which they or some of them were parties.

A history of the transactions out of which this controversy has grown might well begin with the fact that the state of Pennsylvania

made over to the railroad company bearing its name certain property of the state. A part of this was a railroad. Another part was a canal known to this record as the Pennsylvania Canal. The railroad and the canal throughout the length of the latter ran side by side. Later on in time the railroad managers decided to have a canal company organized. It was doubtless deemed of importance to provide against the possibility of the control of the canal passing into hostile hands. Assurance against this was secured through the ownership of its stock. This, in turn, made possible an interlocking directorate. This again, in turn, made certain the selection of friendly officers and a friendly management. This selection of the personnel of officers and managers was extended to the trustee under the mortgage hereinafter mentioned, who and those who succeeded him was always some one who stood high in the responsible executive management of the railroad; the last trustee being the present president of that road. The affairs of the canal company were managed in accordance with this plan.

The fact has already been found by another court, and the situation and relation of the parties and what was done compels the finding, that the affairs of the canal were conducted after its incorporation precisely as they would have been, had the canal management continued to be a department of the railroad, an account of the earnings and disbursements of which was separately kept. This began at the beginning and continued to the end. A canal company was accordingly chartered. The plan of the managers of the railroad, as outlined in the annual report, embraced a supply of capital to the canal company through the expedient of an issue of bonds, the payment of which was secured by a mortgage of its property. An aggregate of $3,000,000 of these bonds was issued. The intimate relations between the canal and railroad companies induced, if indeed they did not compel, the railroad company to become a party to this mortgage. This was effected through an agreement indorsed on the bonds that the railroad company would purchase any of the interest coupons which were not paid by the canal company. This gave to prospective bondholders a satisfying assurance that they would receive the interest as it fell due. Certain provisions (to be hereafter particularly discussed) were likewise made through a sinking fund for taking care of the principal of the bonds at maturity. This gave a like assurance of the payment of the principal. The payment of interest and principal being thus both provided for, the bonds were put upon the market and sold, the plaintiff's predecessor in title becoming the purchaser of some of them. It has been judicially determined in proceedings in equity (hereafter referred to at some length) that the undertaking of the railroad company was not a contract to guarantee the payment of the interest, but a contract to purchase the coupons.

It may be noted in passing that a more simple and direct means of providing a market for the bonds (which was evidently the purpose of the railroad company) would have been to have guaranteed the payment of both interest and principal. We have the opinion of the general solicitor of the railroad company (which affords the explanation

of why the simpler plan was not adopted) that the railroad company was without the corporate power to make a contract of guaranty, but did have full power to enter into a contract of purchase. What has come to pass is that the canal company was unable to pay either interest or principal. The railroad company admitted and, of course, met its obligation to take up by purchase the interest coupons. The bondholders have, in consequence, been paid their interest in full. The provisions made through the covenants of the mortgage for the payment of the principal of the bonds were not met and thus far the loss has fallen upon the bondholders. All the property and assets of the canal company are gone, and have passed almost wholly into the ownership of the railroad company. This has, it is alleged, been brought about, and the affairs of the canal company have been managed and its assets manipulated, by the railroad company in such manner as to result to its gain and the loss of the bondholders.

The plaintiff has brought this proceeding for the benefit of herself and of any other bondholders who may intervene. The general purpose of the bill is to fasten upon the railroad company responsibility for the loss sustained by the bondholders. The plaintiff avers such responsibility to arise out of certain acts of the railroad company. These resulted in acts of omission and commission on the part of the canal company and of the mortgage trustee. These acts may thus be summarized:

The mortgage (as construed by the plaintiff) provided that a sum (which we will call $20,000) should be paid annually into a sinking fund pledged first to the payment of the principal of the bonds at maturity. The railroad company (as already stated) had agreed to cash the interest coupons which the canal company did not pay. The practical situation was in consequence this: If the $20,000 was paid into the sinking fund the payment of the principal of the bonds was made sure, but the railroad company would have that much more to advance in the purchase of interest coupons. If the $20,000 was diverted to the taking up of the coupons, the principal of the bonds would remain unpaid, and the railroad company would save $20,000 annually. The money was applied to the coupons, and the principal of the bonds went unpaid. The railroad company thus gained what the bondholders lost. Another provision of the mortgage was that the sinking fund moneys might be invested in the purchase of the bonds or in other securities. If these funds were invested in the bonds, and the bonds were canceled, the bondholders would lose the accumulations of 40 years or less of interest. If the bonds were held as an investment, the question would arise of whether the contract of the railroad applied to interest coupons held by the sinking fund. No trustee for bondholders could avoid seeing that the bonds should not be canceled, and that none should be purchased unless the payment of interest was assured. Bonds were not only purchased for the sinking fund, but they were also canceled. Here, again, loss resulted to the bondholders and gain to the railroad company. The plaintiff asserts that if the bonds had been held as an investment the railroad company would have been obliged to take up the coupons. However this may be, it is clear that

the sinking fund should not have been invested in the bonds unless interest could be collected.

Still another feature of the situation was this: Some of the real estate of the canal company could be sold without the consent of the trustee under the mortgage. Some of it could be sold with his consent. Some could not be alienated from canal purposes. The property was sold. Much of it, as before stated, passed through such sales into the ownership of the railroad. The charter of the canal company was so changed by a special act of assembly as to give legislative consent to the abandonment and sale of all parts of the canal. The plaintiff avers that in these sale transactions the railroad company sold to itself and bought from itself, and that the prices paid were wholly inadequate. The undoubted fact is that when the bonds matured the canal company was found to be without assets sufficient in value to reach the payment of the principal of its bonds. All that it had went to the railroad company to repay the interest coupons which it had taken up, and which, under the terms of the mortgage as interpreted in the proceeding referred to, were to be first paid before the principal of the bonds.

There are other features of the transaction of which the plaintiff makes complaint. These, for the reason hereinafter stated, we pass without comment. Those referred to will suffice to present the grounds upon which the prayers for relief are based. It is unthinkable that the things which were done would have been done if the resultant loss to bondholders had been forecast. The course of events can only be accounted for upon the supposition that everybody in interest was consenting and that the things done were for their common benefit; it not being then foreseen that the bondholders would have an interest. The consequences are to be regretted, even if redress can be awarded, because of the possibility (as to which the proofs are silent) that the right to redress may have passed from many who really suffered the loss entailed. The general principle of the theory upon which the plaintiff rests her present claim was unchallenged at the argument. There is, because of this, no occasion to discuss it. The language of her counsel may be paraphrased in order to formulate a statement of it. It is that under the facts of this case the railroad company stood in such a relation to the bondholders as that it is bound to make good to them any loss which they have sustained from any wrongful acts of omission or commission done by the railroad company for its benefit, or done by the trustee or the canal company by the procurement of the railroad company.

[1, 2] The claim of the plaintiff is met by a denial that any wrongful act was done. So far as space permits we will take up the mentioned acts in their order. The first is the $20,000 payment into the sinking fund. The provision in the mortgage is as follows:

"First. That the party of the first part [the canal company] shall and will first provide in each year out of the net annual earnings, if sufficient for that purpose a sinking fund of twenty thousand dollars ($20,000.00) per annum, but, if not sufficient therefor, then such sum as shall be equal to the said net annual earnings for the payment of the principal of the bonds hereby secured, commencing on the first day of July, A. D., one thousand

eight hundred and seventy-two (1872), on or before which day the first of said annual appropriations of twenty thousand dollars ($20,000) or other sum as aforesaid shall be made, and the same shall be from time to time invested by said party of the first part in the bonds hereby secured, or in other good securities."

The meaning of which we are in search is to be extracted from the words "net annual earnings." There is small aid to be had from the lexical meaning of "net earnings," and even less from the adjudged cases. The words, in bookkeeping language, mean a balance, or what remains after something has been deducted. What the deduction is, or what is to be included in it, can only be determined from the occasion for the use of the words, or from the context. The occasion here was a pourparler with the prospective bondholders. The words are the words of the railroad company. The purpose of their use was to make a market for the bonds by assuring a business certainty that the bondholders' money would be returned to them, interest and principal, when payable. If this had been the ordinary case of a corporation borrowing money, and the mortgage had been the usual mortgage, there would be a flat absurdity, as counsel for defendant point out, in providing for the payment of the principal at the expense of the interest going unpaid. It was not, however, such a case. The bonds could not have been floated on the credit of the canal company without the railroad. Nor was the mortgage the usual mortgage. It had attached to it this obligation of the railroad company to take up the interest coupons. The contract took this instead of the usual form of a guaranty of principal and interest, because (as already explained) the railroad company could agree to purchase, but could not guarantee. There was a practical difficulty in the way of an agreement to purchase the bonds, because no price could be fixed, and besides this would have defeated the main purpose of the loan. It was unnecessary to agree to purchase the bonds at maturity, if the payment of the principal was assured. At all events what the railroad company said to the investors in the bonds was this: You will receive your interest promptly, because we are a market for the coupons. You are certain to get your principal, because a sinking fund of $20,000 per year is provided for out of earnings before interest is deducted. If it does not have this meaning, the sale of coupons would be at the cost of the principal, and the agreement to buy the coupons was a trap for the unwary.

The further argument of defendant comes to the same thing. It is that the construction contended for by plaintiff is inconsistent with the covenant of the mortgage that all the assets and earnings of the canal company should be applied to interest as well as principal and the finding that the interest was to be first paid. Again we say, if the mortgage were the ordinary mortgage, the argument would doubtless be sound. It is not, however, the ordinary mortgage, but such a mortgage with the covenant of the railroad company added, and with this added such a construction of this clause is entirely consistent with all the covenants of the mortgage. Out of the bond springs the obligation of the canal company to pay both interest and principal. The added contract requires the railroad company to advance the interest,

and the mortgage applies $20,000 of the "net earnings" (before any deduction for interest) to the payment of the principal. We find, in consequence, [the division of] the net annual earnings up to the limit of $20,000 for the benefit and in ease of the railroad company to have been a wrong to the bondholders, who suffered thereby. We think, also, there should be a like finding with respect to the purchase and cancellation of the sinking fund bonds. This finding is not affected by the argument of defendant that the railroad company was not bound to purchase the coupons held by the sinking fund. If the railroad company was so liable, it was a wrong to the bondholders to cancel such obligation for the benefit of the railroad. If the railroad company was not so liable, it was a wrong to the bondholders to invest their moneys for the benefit of the railroad in securities which bore no interest.

We feel relieved of the necessity, at this time, of inquiry into any further wrongs which the bondholders may have sustained. As the practical mathematics of the case have been presented to us, a decree enforcing the above findings will give to plaintiff all the relief to which she is entitled. If this turns out not to be the case, full relief can be accorded at the time of the entry of a formal decree. This brings us to the branch of the defense upon which chief reliance is placed. This rests upon the legal consequences of the litigation to which reference is made. This resulted in a decree of the court of common pleas No. 5 in and for the city and county of Philadelphia, sitting in equity.

[3] The bill was filed at the instance of the railroad company as a holder of bonds. The plaintiff was the trustee under the mortgage. The defendant was the canal company. The railroad company and a large number of other bondholders intervened as parties in interest. The cause reached on appeal the Supreme Court of the state and is reported in Rea v. Penna. Canal Co., 249 Pa. 239, 94 Atl. 833. The principle invoked here is the res adjudicata principle. The general purpose of the bill was to foreclose the mortgage. To one trained under the Pennsylvania system of laws the legal effect may be best expressed by analogy to a judgment in a scire facias sur mortgage proceeding and a decree distributing the fund raised by a sale made under such proceeding. It must be that the decree referred to settled all questions which in legal intendment were involved in the issues there raised. It therefore is the law of the case, and is conclusive of the subject-matter of which and upon the parties of whom the court had jurisdiction and their privies.

Such a proceeding is essentially one in rem. The res at first is the property then subject to the lien of the mortgage and which might be taken and sold in satisfaction of the mortgage debt. It afterwards embraces the fund which is raised by the sale of the mortgaged premises under the foreclosure proceedings. The issues raised are determined by the pleadings. The judgment in the sci. fa. proceeding ordinarily determines the amount for which the plaintiff may have execution against the mortgaged premises, which premises he may sell under the execution and that he may sell whatever estate or interest any one who is a party to the proceedings and subject to the ju-

risdiction of the court has in the premises bound by the lien of the mortgage and affected by the judgment. The decree of distribution determines what the fund is to be distributed, and to whom, and in what order, and in what proportions it is to be paid. If a subsequent action be brought in the same or another court affecting the same subject-matter, or the same parties, as, for illustration, an action in ejectment, or upon the bond accompanying the mortgage, the sci. fa. judgment concludes only the parties to it or their privies in person or estate, and settles only the questions involved in the issues raised or disposed of. If two or more courts have concurrent jurisdiction of the same subject-matter or parties, no one of them will assume to retry what one of the others has thus disposed of, or, if the cause is still pending, to interfere with the exercise of the jurisdiction first asserted. After, however, the first court has rendered its final judgment, and another suit is brought in another court for a different cause of action, although relating to the same subject-matter and affecting the same parties, the second court will proceed to render judgment holding the parties to be concluded only as to those matters which were involved in the judgment first rendered.

This is the recognized application and limitations of the res adjudicata principle. It was applied by anticipation on the demurrer filed in the present case. The averments of the bill of complaint disposed of by the decree of the state court can be gathered from the prayers of the bill. These were, in addition to the final usual general relief prayer, 11 in number. They cover a finding of the mortgage to be a lien and upon what property it was a lien, a finding of what was due upon the mortgage, interest and principal, a finding that the interest was to be first paid, and a decree that the defendant canal company pay the amount so found to be due. In case of the failure of the defendant to pay, the bill prayed for additional decrees. These included a foreclosure of all equity of redemption in the owners of the mortgaged premises, a decree for the sale of the premises directed to be sold, a decree that the moneys in the hands of the trustee representing the parts of the mortgaged premises which had previously been sold be distributed in a certain way, a like decree with respect to the proceeds of the sale directed to be made, a decree that the defendant pay any deficiency in the moneys required to meet the mortgage debt, a decree providing for payment of the purchase moneys by the purchaser, and a decree for the execution and delivery to the purchaser of a deed for the purchased premises.

It is too clear to require statement that the decree of a court of competent jurisdiction, as already stated, must settle as between all persons bound by the decree all questions involved in it. The prayers of the bill in the present case, asking for a decree inconsistent with the decree already ·made in the foreclosure proceeding above mentioned, must therefore be denied. This denial is on the double ground that the decree so made is now the law of this case, and also because inconsistent decrees would evoke a condition of conflict which would be intolerable. This applies as well to the res as to the parties, and is so obvious as to forbid comment. Two courts having concurrent,

but neither having appellate, jurisdiction over the other, cannot enter conflicting decrees, binding the same parties or affecting the same res, without producing a confusion which cannot be cleared otherwise than upon the theory that one of the decrees is void or gives way to the other. The only way to avoid this is to follow the doctrine of comity before, and to apply the res adjudicata principle after, the decree has been made. The res adjudicata principle must not be confounded with that other principle, from which it is entirely distinct, upon which courts of the United States' will, in some cases, follow the rulings of the state courts. In the class of cases in which the latter principle is applied, it is of broader application than the res adjudicata doctrine, and extends to all cases in which a like question of law arises. The doctrine which is invoked by the defense has its limitations and will not afford protection from claims not involved nor adjudicated in the former proceeding. Applying the doctrine to the case now before us, the decree in this prior proceeding in no way involved the equitable principle upon which the present plaintiff's claim is based, nor the liability of the present defendants to account to the plaintiff or to any other bondholders for the loss which was sustained by the diversion of moneys from the sinking fund or depleting this fund for the benefit of the railroad company. This is the only finding the relief to which plaintiff is entitled calls upon us now to make.

[4] The final stand of the defense (in the order in which we have considered the defenses raised) is upon the question of fact. It is doubtless true that the mere fact that one has benefited by the act of another, resulting in loss to a third person, does not render the party benefited responsible for the loss, nor are majority stockholders answerable for the default or even the misconduct of their corporation merely because they are majority stockholders. It is also doubtless true that there is no direct evidence that the Pennsylvania Railroad Company had by any corporate action anything to do with the sinking fund of the canal company. Every corporate act, except such as those which are performed through parliamentary forms of procedure, is done through and by some person or persons. When such persons are acting for the corporation, the only direct evidence which can be had of that fact is their own declaration, or a recorded resolution of its board of directors. If the persons have like relations to two or more corporations, this truth is emphasized. Their corporation, or, if they were connected with two or more, either or any of them, might be found from all the evidence to have done what was done. If the individuals who brought it about that moneys which should have gone to the sinking fund were diverted to the payment of interest, and who invested the sinking fund moneys in bonds and then canceled the bonds, had themselves profited by what they did, as the railroad company has profited, they would certainly be held to the finding that they as individuals controlled their actions as officials. How, then, without throwing away substance for shadow, can we refuse to make a like finding against a corporation under like facts and circumstances? If an individual, who is in an equivocal position, in the sense that he may act for himself or for a corporation of which he is an officer,

acts so that moneys which should have gone to the corporation go to him, he is liable to account for the unlawful gains. Why should not the same inferences, upon which this liability is based, be found against one of two corporations similarly placed? The basis of the finding is not bad faith, but it is an inference required to be drawn by a policy of the law, which, in turn, is based upon hard common sense. No man can serve two masters, and when he is in the service of two nominal masters whose interests conflict he is presumed to have acted for that one who is found to have been the real master.

The findings, so far as deemed necessary to be now made, are embraced in the following conclusions:

1. It was the right of the bondholders under the Pennsylvania Company mortgage to have the net earnings of the company above operating costs and other charges and before payment of the interest due on the bonds applied (up to the limit of $20,000 per year) to the sinking fund provided for the payment first of the principal of the bonds at maturity.

2. It was also the right of said bondholders to have the moneys paid into said sinking fund kept invested in interest-bearing securities until the principal of the bonds became payable.

3. The said earnings of the canal company were diverted to the payment of interest coupons, to the benefit and advantage of the Pennsylvania Railroad Company, and to the equivalent loss of the plaintiff and other bondholders, amounting, with interest, to a sum to be stated in the decree to be entered.

4. Moneys of the sinking fund, amounting to the principal sum of $159,000, were invested in bonds of the canal company, and the bonds were canceled, to the benefit and advantage of the said railroad company, and the consequent equivalent loss to the plaintiff and other bondholders, amounting to a sum to be found, in interest which should have been in the sinking fund and applicable to the payment of the mortgage debt.

5. The diversion of the net earnings of the canal company, and the investment of the sinking fund moneys in said bonds, and the cancellation of the bonds, was done by the said railroad company in the name of the canal company, through its officers and agents, acting for and by command of the railroad company.

6. The said railroad company is answerable to the plaintiff for the loss she has sustained by reason of the said acts. The amount of said loss is found to be the sum of $7,000, with interest from July 1, 1910.

7. The plaintiff is concluded by the decree of the court of common pleas No. 5, in and for the city and county of Philadelphia, Pa., sitting in equity, entitled as of December term, 1910, No. 4799, upon all questions involved in the issues raised in said cause and disposed of by said decree. The said plaintiff, however, is not precluded by said decree from making claim for the loss sustained by her and embodied in conclusions 1 and 2 herein.

8. The plaintiff is entitled to costs.

The draft of a decree carrying into effect the above findings may be submitted, and leave is granted plaintiff to move for further findings

upon any other claims for equitable relief set forth in the bill filed by her, should such findings be necessary to afford the plaintiff full relief. As we understand the practical mathematics of the case, no further findings are called for. Whether they are can be determined when a form of decree is submitted.