PENNSYLVANIA CANAL CO. et al. v. BROWN et al.

BROWN et al. v. PENNSYLVANIA CANAL CO. et al.

(Circuit Court of Appeals, Third Circuit. August 10, 1916.)

Nos. 2114, 2115.

1. JUDGMENT ☞713(2)—MATTERS CONCLUDED—MATTERS NOT DETERMINED.
    While a judgment of a court of competent jurisdiction upon a question directly involved in one suit is conclusive as to that question in another suit between the same parties, to this operation of the judgment it must

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

either appear from the face of the record or be shown by extrinsic evidence that the precise question was raised and determined in the former suit.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1063, 1066, 1099, 1241; Dec. Dig. ☞713(2).]

2. CORPORATIONS ☞482(7)—FORECLOSURE 'OF MORTGAGE—RES JUDICATA—IDENTITY OF PARTIES AND ISSUES.

A decree of foreclosure and distribution in a suit to foreclose a corporation mortgage, to which the mortgage trustee, the mortgagor, and an intervening bondholder, raising a single issue as to the distribution of the fund, were the only parties, *held* not a bar to a subsequent suit by another bondholder to charge one not a party to the previous suit with wrongful diversion to itself of funds of the mortgagor, which by the conditions of the mortgage were to be used to create a sinking fund for the payment of the bonds.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1883–1886; Dec. Dig. ☞482(7).]

3. MORTGAGES ☞109—CONSTRUCTION—EXTRINSIC CIRCUMSTANCES—RELATION AND INTENTION OF PARTIES.

Where there is doubt as to the meaning of terms used in a mortgage, the purpose of the transaction and the intention of the parties, properly ascertained, may be admitted in aid of its solution.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 219, 246, 247, 268; Dec. Dig. ☞109.]

4. CORPORATIONS ☞486—MORTGAGES—CONSTRUCTION—"NET ANNUAL EARNINGS."

The Pennsylvania Railroad Company purchased a system of canals from the state, which for a number of years it operated directly and then organized the Pennsylvania Canal Company, to which it transferred the property, taking practically all of its stock in payment. Thereafter it controlled the canal company through such stock ownership. On its organization the canal company made an issue of bonds secured by mortgage, to which contract the railroad company became a party by agreeing to "purchase" the coupons on their maturity in case of default by the canal company. The mortgage contained the following provision: "First, that the party of the first part will first provide in each year out of the net annual earnings, if sufficient for that purpose, a sinking fund of $20,000 per annum, but if not sufficient therefor then such sum as shall be equal to the said net annual earnings, for the payment of the principal of the bonds hereby secured, * * * and the same shall from time to time be invested by the said party of the first part in the bonds hereby secured or in other good securities." *Held* that, taking into consideration the relations between the two companies, the "net annual earnings" of the canal company applicable to the sinking fund was the difference between the gross earnings and the operating expenses, and that the use of such earnings, without setting aside the sinking fund, for the payment of interest on the bonds, for the relief of the railroad company, was an unauthorized diversion for which the latter company, as controlling owner, was liable to the bondholders.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. ☞486.

For other definitions, see Words and Phrases, First and Second Series, Net Earnings.]

5. STATUTES ☞80(2), 97(2)—CONSTITUTIONAL LIMITATIONS—"SPECIAL LAW"—"HIGHWAYS."

Const. Pa. art. 3, § 7, prohibiting the passage by the General Assembly of "any local or special law * * * authorizing the laying out, opening, altering, or maintaining roads, highways, streets, or alleys * * * creating corporations, or amending, renewing, or extending the charters thereof; granting to any corporation * * * any special or ex-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

clusive privilege or immunity" does not extend to highways of transportation, such as canal or railroad systems, and does not render invalid Act Pa. June 2, 1870 (P. L. 1318), Act May 7, 1889 (P. L. 104), or Act March 16, 1899 (P. L. 9), each authorizing the Pennsylvania Canal Company to abandon for public use portions of its canal system; such acts not being local or special, either with respect to the subject-matter or the corporation, but evidencing a change of policy on the part of the state in regard to canals which had been to a large extent superseded by railroads and had become unprofitable and of little value to the public.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 87, 109; Dec. Dig. ☞80(2), 97(2).

For other definitions, see Words and Phrases, First and Second Series, Highway; Special Law.]

6. CANALS ☞3—CONSTITUTIONAL LAW ☞154(2)—OBLIGATION OF CONTRACTS —STATUTES IMPAIRING OBLIGATION.

Neither are such acts in violation of the federal Constitution, as impairing the obligation of the contract made by a mortgage executed by the canal company before the last two were enacted, which contained no provision requiring the company to retain and operate the property it then owned.

[Ed. Note.—For other cases, see Canals. Cent. Dig. § 3; Dec. Dig. ☞3; Constitutional Law, Cent. Dig. §§ 461–473; Dec. Dig. ☞154(2).]

7. CORPORATIONS ☞186—CONTRACTS—TRANSACTIONS WITH SUBSIDIARY CORPORATIONS.

A corporation, which through stock ownership controls and conducts the business of another, is held to the strictest account and to the observance of the highest rectitude in its transactions with its subsidiary and has the burden of proving their fairness.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 695–701; Dec. Dig. ☞186.]

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Suit in equity by Alice Frances Brown and others against the Pennsylvania Canal Company and Pennsylvania Railroad Company. Decree for complainants, and both parties appeal. Affirmed.

For opinion below, see 229 Fed. 444.

John Hampton Barnes, of Philadelphia, Pa., for Pennsylvania Canal Co.

Francis I. Gowen and John G. Johnson, both of Philadelphia, Pa., for Pennsylvania R. Co.

Thos. Racburn White and John Cadwalader, Jr., both of Philadelphia, Pa., for appellees.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. These are cross-appeals from a decree of the District Court based upon findings for and against the parties on several issues raised by the pleadings. 229 Fed. 444. The issues on the merits are distinct, and being separately presented, may be separately decided. Preliminary to their consideration, however, it will be necessary to dispose of a defense to the action, extending to all matters involved in both appeals, which challenges the plaintiff's right to maintain her action in the District Court, because, as it is

alleged, the matters there presented could have been and therefore should have been determined in a previous action in another court. This defense is one of res adjudicata. We must therefore inquire what issues were involved and decided in the two actions, and whether the controversy in each was between the same parties or their privies. A very brief outline of the two cases will develop the facts.

In 1866, the Pennsylvania Canal Company acquired from the Pennsylvania Railroad Company certain canal properties. In 1870, the Canal Company placed a mortgage on the properties for $5,000,000 to secure bonds for a like amount, of which $3,000,000 were issued. The mortgage provided for an annual appropriation of $20,000 from the net earnings to a sinking fund for the payment of the principal of the bonds, and the bonds bore by endorsement the obligation of the Railroad Company to "purchase" the coupons in the event of interest default by the Canal Company.

The business of the Canal Company decreased from year to year, and from various causes the canals fell apart and were abandoned. During this transition, the Canal Company sold many of its properties to the Railroad Company, under powers contained in the mortgage, the proceeds being applied in part to the purchase and retirement of its bonds. In 1888, the Canal Company defaulted in interest payments and the Railroad Company thereafter purchased the coupons.

After the mortgage matured in 1910, the trustee filed a bill of foreclosure in the Court of Common Pleas, No. 5, of Philadelphia County, State of Pennsylvania, praying a decree that he be awarded execution of the mortgage and be directed to apply the uninvested proceeds from sales previously made, as well as the proceeds of sales to be made under the decree, to the payment of interest coupons in priority to payment of the principal of the bonds. The Railroad Company was the sole holder of the coupons. The parties to that action when begun were Samuel Rea, trustee under the mortgage, and Pennsylvania Canal Company, mortgagor. John Cadwalader, a bondholder, intervened, and by appropriate pleadings between himself and the original parties, raised the issue that uninvested proceeds of sales were applicable to the payment of the principal of the bonds in priority to the payment of interest. That was the only controverted matter tried in that case. Its decision depended upon the character of the undertaking of the Railroad Company to take up defaulted interest coupons. The trial court found that the undertaking was one of payment and not of purchase. This finding was reversed by the Supreme Court of Pennsylvania, Rea, Trustee, v. Pennsylvania Canal Co., 245 Pa. 589, 91 Atl. 1053, which held that the contract was one of purchase and not of payment, that having purchased the coupons, the Railroad Company held them with all the rights of bondholders, and that the obligation of the bonds gave priority to interest over principal in the application of proceeds of sales.

That decree was pleaded as res adjudicata of the issues in this action before the District Court, not because the issues there presented had been decided in the action before the State court, but upon the contention that the issues raised in the action in the Federal Court

could have been and in legal propriety should have been raised and decided in the action in the State court; and therefore the plaintiff was precluded from maintaining this action in the District Court.

While the case in the State court was pending, Alice Frances Brown brought this action in the District Court of the United States against the Pennsylvania Canal Company, Pennsylvania Railroad Company and others, charging, by original and supplemental bills, three things: First, that the Railroad Company had caused the Canal Company to divert the annual sinking fund appropriations from the sinking fund to the payment of interest coupons, to the relief of its obligation to purchase the same; second, that certain conveyances made by the Canal Company to the Railroad Company were void in that they were made under authority of an invalid enactment; and third, that the considerations for properties otherwise validly sold were inadequate. It is conceded that these matters were not in issue in the State court. This is certain, for the first ground of action was raised in the District Court by a supplemental bill filed after the decree in the State court, and the other two grounds were expressly excluded by the trial judge from his findings.

The District Court found that the plaintiff was not precluded by the judgment of the State court from maintaining this action against the Railroad Company for diverting moneys from the sinking fund to her injury, but that she was precluded by the decree of the State court from urging in this action her claims of invalid conveyances of mortgaged properties and the payment of inadequate considerations for properties purchased.

[1, 2] It is undoubtedly settled law that a judgment of a court of competent jurisdiction, upon a question directly involved in one suit, is conclusive as to that question in another suit between the same parties. But to this operation of the judgment it must appear, either from the face of the record or be shown by extrinsic evidence, that the precise question was raised and determined in the former suit. Russell v. Place, 94 U. S. 606, 608, 24 L. Ed. 214; Cromwell v County of Sac, 94 U. S. 351, 353, 24 L. Ed. 195; Linton v. National Life Ins. Co., 104 Fed. 584, 587, 44 C. C. A. 54; Harrison v. Remington Paper Co., 140 Fed. 385, 400, 72 C. C. A. 405, 3 L. R. A. (N. S.) 954, 5 Ann. Cas. 314. It is admitted that in these cases the precise questions were neither raised nor determined. It is also admitted that the plaintiff in the action before us was at no time a party to the action in the State court, and that the Pennsylvania Railroad Company, the defendant in this action, was not a party to the action in the State court, except after trial, when it was admitted to the record, by consent of counsel, nunc pro tunc, for the purpose of appeal.

In a general way, we may assume as true the position of the defendants that it is a claimant's duty to assert in one action all rights he may have against the defendant, but clearly that duty is limited to the assertion only of those rights which are germain to the matter in controversy and are appropriate to the form of action, and which have been invaded or defeated by the party against whom the action is brought. The action in the State court was one of foreclosure;

the parties were the trustee of the mortgage, the mortgagor and an intervening bondholder raising the single question of priority 'to funds; and the decree was one of foreclosure and distribution. The Pennsylvania Railroad Company was not charged with wrongdoing, and if such a charge had been made, no conceivable decree could have reached it, until it had become a party and presented a defense. But the action in the District Court was against the Pennsylvania Railroad Company and recovery was sought for alleged unlawful conduct in diverting funds from the plaintiff to itself, the cause of action and the remedy being as distinct from and unrelated to the proceeding of foreclosure in the State court as though it were in tort.

We are satisfied that the first ground of the plaintiff's action charging the Railroad Company with responsibility for diverting moneys from the sinking fund was in no sense germain to the action of foreclosure in the State court, and that the District Court committed no error in hearing and determining that issue.

The claim of invalidity of certain conveyances might conceivably have been asserted in the foreclosure proceeding by the trustee or an intervenor in determining what properties were covered by the mortgage, though we are slow to see how the claim of inadequate considerations could have been tried and decided in that form of action. Although the District Court held that the plaintiff was precluded by the decree of the State court from maintaining her action upon the last two grounds, we prefer to pass upon their merits, in view of the importance of the questions presented and amounts involved, rather than dispose of them by what is at best a doubtful legal impediment to their consideration. We, therefore, assume that the plaintiff was not precluded by the decree of the State court from obtaining in this case a determination of these issues, Powers v. Blue Grass B. & L. Ass'n (C. C.), 86 Fed. 705, and will consider them on the plaintiff's appeal under her assignments charging error to the court for refusing to find the conveyances invalid and the considerations inadequate.

### Appeal of Pennsylvania Railroad Company and Pennsylvania Canal Company.

In this appeal we are called upon to construe the sinking fund provision of the mortgage, to inquire into actions of the Canal Company in carrying that provision into effect, and to determine the liability of the Railroad Company for the conduct of the Canal Company. The mortgage extended over a period of forty years. By its sinking fund clause, the Canal Company was required to appropriate annually to the sinking fund "for the payment of the principal of the bonds" the sum of $20,000 out of the "net annual earnings," if sufficient, and if not, then a sum equal to the whole net annual earnings. During 24 years, the net annual earnings, if determined by the difference between gross earnings and operating and other expenses, *not including interest charges,* aggregated $415,309.71, and were sufficient in each of those years to allow an appropriation to the sinking fund of $20,000 or less. If, in ascertaining net earnings, interest is chargeable against gross earnings, there were but two years of the twenty-four

when the net earnings thus calculated were sufficient for sinking fund appropriations. During the remaining years of the mortgage there were no net earnings, howsoever calculated, applicable to the sinking fund. At different times, the Canal Company appropriated to the sinking fund various amounts, aggregating not over $62,465.70. It withheld from the sinking fund the earnings of all other years and applied them mainly to the discharge of its interest obligations, either directly to the bondholders or to the Pennsylvania Railroad Company, the holder of purchased coupons, construing the expression "net annual earnings" to be such as remained after deducting interest charges as well as all other expenses.

With the funds paid into the sinking fund, $159,000 of the bonds of the Canal Company were purchased. Interest on the coupons of these bonds was paid to the sinking fund until 1885, but in 1886 default was made and thereafter the Canal Company closed out the sinking fund by returning to its treasury the money then in hand and by cancelling the sinking fund bonds. Thereby and to that extent the Railroad Company was relieved of its obligation to purchase the sinking fund coupons. As the cash balance of the sinking fund was withdrawn, and the sinking fund bonds cancelled, and as no appropriations to the fund were thereafter made, there was no fund with which to discharge the principal of the bonds at maturity. The plaintiff, a bondholder, thereupon brought this suit, and among other things charged, that the Canal Company violated its undertaking to make annual appropriations to the sinking fund when there were funds applicable thereto.; that it diverted such earnings from the sinking fund to the discharge of its interest obligation and to the relief of the obligation of the Railroad Company to purchase interest coupons; that it annulled the operation of the sinking fund provision by cancelling such bonds as the sinking fund held, and by appropriating to its own use the sinking fund cash balance; that it pursued this conduct under the influence and direction of the Railroad Company, to the advantage of the latter and to a corresponding detriment of the plaintiff and other bondholders; and prayed that the Railroad Company restore to the trustee, for the discharge of the principal of the bonds, the amounts so diverted, with interest.

The District Court found that:

"The loss sustained by said bondholders through the act of the said Pennsylvania Railroad Company in causing moneys to be diverted from the sinking fund provided for the payment of the principal of said bonds, and in causing the moneys in said sinking fund to be invested in the bonds of the Canal Company and then cancelled, amounted, on July 1, 1910, to the sum of $1,379,941.28."

The court decreed, among other things, that:

"The said Pennsylvania Railroad Company * * * pay to Samuel Rea, trustee for said bondholders, the said sum of $1,379,941.28, with interest thereon from July 1, 1910, the same, when so received, to be disbursed and distributed by him to and among the said Alice Frances Brown and the other holders of said bonds of the Canal Company, as the court shall direct."

This is an appeal from that part of the decree.

In this appeal, as in the case below, two questions are involved, first, the meaning of the expression of the sinking fund, "net annual earnings;" and, second, the fact and extent of the Railroad Company's relation to and corresponding liability for what the Canal Company did and failed to do. For defense, the Railroad Company maintains that under a proper construction of the terms of the mortgage, the Canal Company was not in default, and were it otherwise, the Railroad Company did not induce the default and is not responsible for it.

In the consideration of this defense, the Railroad Company insists that we ignore the origin of the mortgage transaction and its purpose, the Railroad Company's continued hold upon and use of the mortgaged properties, and its relation to the Canal Company, except that of stock control, and asks that the case be decided upon the terms of the mortgage as though they were free from ambiguity, and upon the absence of direct evidence of acts of the Railroad Company affecting the conduct of the Canal Company.

[3] The protracted litigation, both in State and Federal courts, arising out of this mortgage, testifies to the uncertainty of its terms, and the fact that the Railroad Company was an actor in creating the Canal Company and in participating in the obligation and floatation of the mortgage warrants an examination into the origin, conduct and purpose of the transaction, in order to determine the meaning of terms which were employed or subscribed to by the Railroad Company. When there is doubt as to the meaning of terms, the purpose of the transaction and the intention of the parties, properly ascertained, are not infrequently admitted in aid of its solution. Pullman's Palace Car Co. v. Missouri Pacific Ry. Co., 115 U. S. 587, 6 Sup. Ct. 194, 29 L. Ed. 499. We are therefore of opinion, that the actions of the Railroad Company in relation to the Canal Company and its properties, have an evidentiary bearing upon the meaning of the terms of the mortgage by which the properties were encumbered.

[4] The canal properties covered by the mortgage now in suit were constructed by the Commonwealth of Pennsylvania and for a period of years were owned and operated as a part of the State Public Works. The main line of the Public Works included a railroad from Philadelphia to Columbia, a canal thence along the east bank of the Susquehanna River to a point opposite the mouth of the Juniata River, thence crossing the Susquehanna to Duncan's Island and along the valley of the Juniata to Hallidaysburg. From that point a portage railroad, so constructed as to carry canal boats in sections, ran by inclined planes over the mountains, and connected with a canal leading to Pittsburg. This line was completed in 1834.

The Pennsylvania Railroad Company was incorporated in 1846 and completed its line from Harrisburg to Pittsburg in 1854. It also operated a line from Harrisburg to Lancaster. The line of the Railroad Company ran parallel with the canal line of the State for a considerable part of its length. By authority of the Act of May 16, 1857 (P. L. 519), the main line of Public Works, above described,

was sold by the Commonwealth of Pennsylvania to the Pennsylvania Railroad Company, for the sum of $7,500,000. From 1857 to 1866, the canals were operated by the Railroad Company as its canal division. By the purchase of the canal properties, the Railroad Company acquired the fee to the land, encumbered, however, by prior liens and obligations, amounting to about $2,000,000. Having held and operated the properties for a period of eight years and recognizing their need of repair and enlargement, and that the obligations for which they were pledged as security were approaching maturity, the Railroad Company signified its purpose in its annual report of 1865 to change the manner of holding and enlarging them (at least with respect to a part) "by the organization of a separate company for these works" and to pursue a plan for raising money "by a mortgage upon them." To that end the Railroad Company caused the Pennsylvania Canal Company to be incorporated, and under authority of the Act of May 1, 1866 (P. L. 1068), sold to the Canal Company the fee of all its canal properties.

The Railroad Company took the stock of the Canal Company in exchange for its properties, acquiring thereby nearly all the capital stock of the Canal Company, and thereafter exercised an indirect control over the properties by stock ownership in lieu of its previous direct control by property ownership.

In 1870, the Railroad Company completed its purpose to change the character of its holding and to finance the canal. In that year the indebtedness of the Canal Company amounted to $2,367,000, consisting chiefly of issues of bonds by which the properties were encumbered when purchased by the Railroad Company. It was estimated that the sum of $150,000 was needed for repairs and improvements. To meet these obligations and requirements, the Commonwealth, by the Act of June 2, 1870 (P. L. 1318), authorized the Canal Company to borrow money and pledge its property by mortgage. Acting under this authority, the Canal Company immediately set about to discharge its underlying obligations and raise additional money by the mortgage and bonds now in suit. To this end the Railroad Company did not limit its influence over the Canal Company to stock control, but entered directly into the mortgage transaction, and voluntarily assumed a contractual obligation in connection with it, which ultimately amounted to many millions of dollars. What was the purpose and legal effect of the Railroad Company's participation?

From the mortgage and its terms, as well as from the annual reports, several inferences may properly be drawn. The first is, that the Canal Company was without funds with which to meet its obligations and requirements; the second is, that the Railroad Company was not inclined to supply such funds from its own treasury. The plan therefore was to raise money from outside sources upon the security of the canal properties. The Railroad Company was a party to this plan.

The properties were already encumbered. It may be assumed that at that time they were a fair security for the debts. As instrumentalities of transportation, canals had not then been superseded by

railroads, at least with respect to such rough staples as iron, lumber and coal. At that time the business was represented to be good and full of promise. The underlying obligations were first liens upon the properties, and their holders were able to prevent sales free of liens, and, in the event of default, were in a position to exact of the Railroad Company the protection of their holdings, or cause it to submit to foreclosure and sale with competitive bidding for properties, for the equity in which it had but recently paid $7,500,000.

To induce the holders of the underlying obligations to surrender their liens and forego this advantage, the Canal Company and the Railroad Company had to offer an equally attractive security. So the Canal Company issued a prospectus of the new bonds, showing their merit and offering them to the holders of the underlying bonds in exchange and to the public for sale. Aside from showing the excellent condition of the revenues, tonnage carried, prospective business, etc., the prospectus called attention to provisions of the proposed mortgage for the payment of principal and interest of the bonds. It pointed out the mortgage provision for a sinking fund "sufficient to retire the whole debt at maturity," and set forth the obligation of the Railroad Company to purchase all coupons upon which the Canal Company might default. This evidently was acceptable to the holders of the old bonds, as well as to investors, and upon exchange being made, the properties were discharged from their underlying obligations. Now, what were the terms of the mortgage and what was done in executing its provisions?

The mortgage was an unusual one, and was evidently drawn with a regard to the original purposes for which the canal properties were acquired by the Railroad Company. The line of canals, as we have seen, ran parallel to the Railroad Company's line of rails, traversing the state and crossing the mountain range through valleys of easy grades and therefore of vast importance. The Railroad Company desired these canals for some purpose or purposes. Of these several are obvious, yet as they were not testified to, we are not inclined to discuss them. At all events, the Railroad Company paid $7,500,000 for the right to use the canals in its business, which it did by never losing control of them, and by gradually absorbing the properties that comprised the canal beds and using them as roadbeds in important links in its main line from Harrisburg to Pittsburg.

The occasion for the mortgage being unusual, the mortgage itself contained many unusual features, which, however, were entirely consistent with the purposes for which the properties were acquired and with the legitimate objects for which they were held and mortgaged. Among these were the right of the Canal Company to abandon and dispose of the properties at private sale clear of the lien of the mortgage, and apply the proceeds to the purchase of the bonds, and the right of the trustee, upon default of interest payments, either to enter upon the mortgaged premises and operate them, or to sell them at public sale, and in either event to apply the income or proceeds first to interest and then to principal. As the property was primarily pledged for the payment of interest (Rea, Trustee, v.

Pennsylvania Canal Co., 245 Pa. 589, 91 Atl. 1053) and as the whole or any part of it could at any time be withdrawn from the secondary pledge for the payment of principal and sold free of the lien of the mortgage, it is reasonable that the bondholders surrendering first lien obligations in exchange for the bonds of the mortgage, should exact and the mortgagor give some security for the payment of principal. And such we find in the very first provision of the mortgage. It is as follows:

"First. That the party of the first part will first provide in each year, out of the net annual earnings, if sufficient for that purpose, a sinking fund of $20,000 per annum, but if not sufficient therefor, then such sum as shall be equal to the said net annual earnings, for the payment of the principal of the bonds hereby secured * * * and the same shall from time to time be invested by the said party of the first part in the bonds hereby secured, or in other good securities."

We are called upon to construe the expression "net annual earnings." In interpreting that expression, we receive little aid from the cases in which it has been given an adjudged meaning, for in those cases, as in this, the meaning is controlled by the sense in which the expression is used in connection with the context and in connection with its evident purpose. The plaintiff maintains that the difference between gross earnings and operating expenses constitutes net earnings, first, because of authorities holding that view, United States v. Kansas Pacific Ry. Co., 99 U. S. 455, 25 L. Ed. 289; State ex rel. St. Charles R. R. Co. v. Assessors, 48 La. Ann. 1156, 20 South. 670; Commonwealth v. Pa. Gas Coal Co., 62 Pa. 241; St. John v. Erie Ry. Co., 10 Blatch. 271, 21 Fed. Cas. 167, 171, No. 12,226; Id., 89 U. S. 136, 22 L. Ed. 743, and second, because of the purport of the phrase, gathered from the terms of the whole instrument. The defendants hold to the opposing view, because of authorities contra, Union Pacific Railroad Co. v. United States, 99 U. S. 402, 25 L. Ed. 274, and upon the ground that as the general terms of the mortgage gave priority to interest in income from operations after entry, and in proceeds from sales, a like priority was intended to be given in earnings.

Reading the sinking fund clause in connection with the terms of the whole mortgage, we are of opinion that the expression "net annual earnings" meant the surplus of earnings after deducting operating and other expenses from gross earnings, and that interest payments having been otherwise provided for in the peculiar situation out of which the mortgage arose, were not properly chargeable against gross earnings in priority to the annual appropriations to the sinking fund. We therefore agree with the trial court that the Canal Company improperly diverted money from the sinking fund to the payment of interest.

Is the Railroad Company liable for the conduct of the Canal Company in violating the sinking fund provision of the mortgage? We may say, in the first place, there was nothing objectionable in the plan by which the Railroad Company held and financed its canal properties, if it were willing to abide the legal consequences. In its intention to hold fast the properties it had acquired at great cost for

its business purposes, no fraud is charged. In the transfer of title and re-acquisition of the properties for its railroad construction, under a mortgage, the terms of which were obviously framed with an especial regard to such re-acquisition and use, the Railroad Company is not open to the insinuation of legal or moral wrongdoing. It was merely doing with its own property through the medium of another corporate entity what it could legally have done if it had retained title in itself. But in employing the conveniences of another instrument and in using in that connection the money of others, the Railroad Company should not complain if the law imposes upon it the normal responsibility incident to such an arrangement. The Railroad Company avowed its purpose to operate and dispose of certain of its canal properties through a separate corporation rather than by direct ownership. It chose to do indirectly all that it could do directly. The transfer of control by property ownership to control by stock ownership was a change only in form.

The control of the Canal Company by the Railroad Company was very different from the corporate control considered in the case of Pullman's Palace Car Co. v. Missouri Pacific Ry. Co., 115 U. S. 587, 6 Sup. Ct. 194, 29 L. Ed. 499, where the holder of a majority of the stock of a corporation was not held responsible for its acts. In the case before us, the stock ownership gave the power to control. But it is upon the exercise of that power, and not upon its mere possession, that we base our judgment of the responsibility of the Railroad Company for the conduct of the Canal Company. The Railroad Company created the Canal Company for its own use, acquired complete control over it by acquiring nearly all its stock, organized it by electing officers from its own directorate, participated in the obligation of a mortgage, the advantages of which it conceived and announced, and to the completed terms of which it subscribed, re-acquired the pledged properties from time to time as it needed them through the acts of the two corporations upon terms fixed by the same men acting as directors for both, with the consent of the trustee of the mortgage who was always a high official of the Railroad Company or of a subsidiary company, and permitted moneys to be diverted from the sinking fund to its own advantage. By this conduct the Canal Company was made and continued to be merely an adjunct or instrumentality of the Railroad Company, and, with respect to the bondholders as third persons, the legal fiction of separate corporate responsibility based upon distinct corporate existence disappeared. Pittsburgh & Buffalo Co. v. Duncan (C. C.) 232 Fed. 584; Foard Co. v. Maryland, 219 Fed. 827, 135 C. C. A. 497; and cases cited. We are therefore of opinion that the Railroad Company is liable for the loss occasioned the bondholders by the failure to maintain the sinking fund.

The sinking fund clause of the mortgage provided that the sinking fund appropriations "shall be from time to time invested by the said party of the first part (Canal Company) in the bonds hereby secured or in other good securities." The expressed object of the sinking fund was provision "for the payment of the principal of the bonds." After the Canal Company ceased to pay the interest on

the sinking fund bonds in 1885, the Canal Company closed out the sinking fund by transferring the cash balance and cancelling the bonds. By the cancellation of the bonds the Railroad Company was relieved of the purchase of their coupons. The Railroad Company maintains that it is not liable to the sinking fund for the money it saved by the cancellation, first, because the cancellation was not its act, and second, because its obligation to purchase coupons extended only to the "holders" of the canal bonds, and that the Canal Company could not be a holder of its own bonds. With respect to the first position, we are of opinion that the Railroad Company is liable for the act of the Canal Company, for the reasons before given; with respect to the second, it is sufficient to say that the sinking fund clause provided for the purchase of the Canal Company bonds for a sinking fund purpose, that the bonds in the sinking fund were there held in trust for the discharge of the principal of the outstanding bonds, and being held by the Canal Company not for itself but in trust for the bondholders, the holding was within the meaning of the Railroad Company's obligation to purchase their coupons. The Canal Company, holding the bonds in trust, had no more right to cancel them and to stop interest accretions thereon, than it had to cancel the bonds or obligations of any other corporation held in the sinking fund upon the same trust.

That part of the decree of the District Court from which the Pennsylvania Railroad Company and the Pennsylvania Canal Company appealed, is in all respects affirmed.

## Appeal of Alice Frances Brown et al.

[5] By the second ground of her action, the plaintiff attacked the Railroad Company's title to that part of the Juniata Division of the Pennsylvania Canal, lying east of Huntingdon, upon the contention that the property was abandoned by the Canal Company and sold to the Railroad Company without legal authority, and therefore the conveyances are void. The plaintiff charges error to the District Court for refusing to find the conveyances invalid.

In considering this issue, it must be remembered that the canals in question formed at one time a part of the Public Works of the Commonwealth of Pennsylvania, and that the legislation respecting those works reflects the canal policy of the Commonwealth. The canals were constructed and owned by the Commonwealth and for many years were operated by it as a part of its State function. By the Act of May 16, 1857 (P. L. 519), the Commonwealth changed its policy to the extent of ownership and operation, by selling its main line of canals to the Pennsylvania Railroad Company, but it held to its policy of providing for the public an instrumentality of transportation by requiring of the purchaser:

"That the said sections of canal and railroad and every part thereof, except as hereinafter provided, shall be and remain a public highway and kept open and in repair * * * for the use and enjoyment of all parties desiring to use and enjoy the same."

By the Act of May 3, 1864 (P. L. 725), the Commonwealth further declared its policy with respect to canals as public works, by providing that the canals shall be maintained "in a condition of repair and fitness for use, which shall, at all times, during seasons of navigation, be equal to, and not inferior to, the condition of repair and fitness for use, in which the same were, at the time the Commonwealth delivered the same into the purchasers' possession."

In that period of the history of transportation, canals were recognized as useful and efficient instrumentalities. So, when the Railroad Company was authorized to sell the main line of canals to the Pennsylvania Canal Company, the Commonwealth, by the Act of May 1, 1866 (P. L. 1068), again declared its policy to provide canal systems of transportation for public use, by requiring the new purchaser to "keep said canal in good navigable condition during the season of navigation." Under legislation to this period, the owners of canals were bound to maintain them for public use, and they were without power to abandon them or diminish their public operation.

By the year 1870, railroads were rapidly encroaching upon the business of canals as means of public transportation, and the need of transportation avenues maintained or controlled by the Commonwealth was correspondingly diminished. In the Act of June 2, 1870 (P. L. 1318), the Commonwealth indicated its first change of policy. By this Act, the Pennsylvania Canal Company was authorized to execute the mortgage now in issue, and was given power "to abandon for public use, such portions of their roads or lines of improvement as may be deemed by such board unnecessary to be kept open for public use * * * provided further that nothing herein contained shall be construed so as to authorize the abandonment of any part of the North Branch Canal, north of Wilkes Barre, or of that part of the Pennsylvania Canal on the Juniata River, east of Huntingdon."

[6] The policy of the Commonwealth with respect to the maintenance of canals for public use was further and finally declared by Acts of May 7, 1889 (P. L. 104), and March 16, 1899 (P. L. 9), under which the owners were authorized to abandon the public use of the parts of the Juniata Division excluded from the provisions of previous acts and theretofore required to be maintained.

Although in framing the mortgage under authority of the Act of 1870, the Canal Company assumed a right to abandon and sell "any portion" of the canals, it did not attempt to exercise that right with respect to the Juniata Division until it was expressly conferred by the Acts of 1889 and 1899. Parts of the Juniata Division were subsequently abandoned for public use and sold to the Railroad Company. The conveyances are now attacked as invalid because of the alleged invalidity of the enactments under which they were made.

It is maintained that the Acts of 1889 and 1899 are void because they are special laws forbidden by Article 3, § 7 of the Constitution of Pennsylvania, which provides that:

"The General Assembly shall not pass any local or special law * * * authorizing the laying out, opening, altering, or maintaining roads, highways, streets, or alleys * * * creating corporations, or amending, re-

newing, or extending the charters thereof; granting to any corporation, association, or individual, any special or exclusive privilege or immunity."

It is urged that the canals of the Pennsylvania Canal Company were "highways," and the legislation authorizing their abandonment was special in character, and therefore forbidden by the Constitution. The evils which such an enactment is intended to check, are familiar to all. In forbidding the legislature to enact local or special laws with respect to "roads, highways, streets, or alleys," when resort is made to it for authority to open, alter or abandon the same, the framers of the Constitution had in mind a well known practice. This they intended to stop, and until we are shown an interpretation by the State courts to the contrary, we are of opinion that the provision does not extend to highways of transportation, such as canal and railroad systems. Subjects of such vast importance are not apt to be left to implication or to be embraced in general terms. The fundamental policy of a government respecting the public transportation systems of a great state, is not likely to be declared by one inclusive word, such as highways, especially when used in connection with the words,—roads, streets and alleys.

We are of opinion that the canals in question were not highways within the meaning of the Constitution and that the laws in question were not enacted in violation of its provision.

But it is further urged that the Acts of 1889 and 1899 were local and special laws, in effect amending the charter of the Canal Company, and conferring upon it a special immunity by relieving it of the burden of maintaining the canals, and for those reasons are invalid.

Before the last enactment in question, the business of canals as systems of transportation had been almost wholly superseded by railroads. This was demonstrated by the failing business and fading receipts of such systems. Prior to the Act of 1899, the canal line under consideration had lost its eastern outlet to tidewater by the abandonment of a connecting canal owned by another corporation; and its western line had been destroyed by the Johnstown flood.

In pursuing its policy with respect to canals as public works, the Commonwealth had retained in itself power to enforce the maintenance of a part of the Juniata Division for public uses. It was clearly within its power to continue, alter or abandon that policy. It retained the right to judge whether that portion of a disconnected and in part demolished canal line any longer served a public use and should any longer be maintained. It exercised that right, and, by the Acts of 1889 and 1899, made its last declarations of its canal policy in that regard. That the Canal Company was relieved of a burden, is unquestioned. That relief, however, was a result of a law respecting a public matter, and did not constitute an amendment to a private charter or the grant of a privilege or immunity that would not have extended to any corporation holding property affected by that legislation.

And lastly it is maintained, that the Acts of 1889 and 1899 are unconstitutional, because they impair the contractual obligation of the

mortgage. The basis of this contention is, that at the time the bonds were issued, the law required the maintenance of a part of the Juniata Division, that thereby the purchasers of the bonds were assured a continuing security, and by the Acts of 1889 and 1899 that assurance was withdrawn and the security destroyed.

It is sufficient to say in this connection, that between the obligor and the obligees of the mortgage there was no contract that the properties in question should not be abandoned; on the contrary, the mortgage contemplated their abandonment under general terms which gave to the obligor the right to abandon and sell "any portion" of the mortgaged properties. The acts, therefore, could not have impaired the obligation of a contract which never existed. But it is maintained that the bondholders' rights were fixed by the law and not limited by the terms of the mortgage. Between the obligees of the mortgage and the Commonwealth there was, of course, no contract. It can scarcely be held that the acceptance by the obligees of the security of the mortgage under the law as it then stood, placed upon the Commonwealth an obligation to maintain its policy with respect to public transportation and to avoid legislation that might alter the law or disturb their security.

We are of opinion that the acts in question are not unconstitutional for the reasons given, and that the conveyances made under their authority are not invalid.

[7] We now reach the question of the adequacy of the considerations paid for properties purchased by the Railroad Company from the Canal Company, the last question we think necessary to discuss. The conveyances attacked by the plaintiff's bill are sixty-six in number. Of these, eleven were considered at the hearing and eight at the argument.

In support of the contention that the Railroad Company acquired from the Canal Company the plaintiff's security, without giving adequate consideration therefor, law is cited about which there can be no dispute. It is, that where one corporation deals through another, which it privately owns and directs, and in effect makes a sale to itself, the burden of proving the fairness of the transaction and the adequacy of price devolves upon it. Goodin v. The C. & W. Canal Co., 18 Ohio St. 169, 98 Am. Dec. 95; Sage v. Culver, 147 N. Y. 241, 41 N. E. 513; Farmers' Loan & Trust Co. v. N. Y. & N. Ry. Co., 150 N. Y. 410, 44 N. E. 1043, 34 L. R. A. 76, 55 Am. St. Rep. 689; Stebbins v. Michigan W. & T. Co., 212 Fed. 19, 129 C. C. A. 471; Barrie v. United Ry. Co., 125 Mo. App. 96, 102 S. W. 1078; Geddes v. Anaconda Copper Mining Co. (D. C.), 197 Fed. 860. So in a case like this, where a corporation owned and operated a property in its business of transportation, and changed the manner of its holding and the method of its operation by organizing another corporation, to which it conveyed the property, with which it co-operated in raising money on the property conveyed, and through which it thereafter indirectly conducted the same business which it had before conducted directly, that corporation is held to the strictest account and to the observance of the highest rectitude in its transac-

tions with its subsidiary. In an ordinary transaction of purchase and sale between independent corporations, it is the interest and the right of the vendee to acquire the property at the lowest price possible, and of the vendor to sell it at the highest. No other considerations enter. But in a transaction of purchase and sale between interrelated corporations, where the control of one by the other is active and complete, and where the acting officers of the two are identical—in other words, where, as in this instance, the Railroad Company undertakes to deal in the double capacity of vendor and vendee with respect to property in which third parties have interests, and where the transaction is possible only by obtaining the consent of the representative of those equitably interested, who is one of its own officers, something more is required of the purchaser than to obtain the property on terms most advantageous to itself. A corporation in such a relation bears a duty to those whose security it is taking, to pay for it all that it is worth, and it makes the purchase at the peril of being called upon to prove the good faith of the transaction and the adequacy of the consideration.

In the plaintiff's attack upon the adequacy of considerations paid for properties purchased by the Railroad Company, fraud and bad faith are neither charged nor found. The plaintiff says that the Railroad Company was careless of her rights, that it has property in which she is interested for which it paid too little, and calls upon it to show that the amounts paid were sufficient, and failing, to pay the deficiency to the trustee of the mortgage for her benefit. She went further, however, and assumed to show that in certain instances the considerations were inadequate.

The testimony of adequacy and inadequacy of prices paid many years ago for properties then open to limited uses and since subjected to many changes, is of little assistance in doing exact justice between the parties in this case. It is quite impossible at this late date to determine, as a matter of fact, precisely what the several properties were worth when purchased. Without discussing the evidence, which we have seriously and laboriously considered, we may state that, in our opinion, the testimony for the Railroad Company prima facie shows adequacy, and that the testimony for the plaintiff does not overcome or disturb that prima facie showing. We therefore hold that the trial court committed no error in refusing to find that the properties were acquired for inadequate consideration.

For the reasons given, that part of the decree of the District Court, embraced in this appeal, is in all respects affirmed.